No. 92-499

IN THE SUPREME COURT OF THE STATE OF MONTANA

1993

EDMUND F. SHEEHY, CATHERINE N. SHEEHY,
JUNIUS CHADWICK, LILLIAN PAUL, and
BEN JOHNS, on behalf of themselves, and
all other similarly situated taxpayers,

Plaintiffs and Appellants,

-vs-

PUBLIC EMPLOYEES RETIREMENT DIVISION,
TEACHERS RETIREMENT DIVISION, DEPARTMENT
OF ADMINISTRATION; STATE OF MONTANA;
and DEPARTMENT OF REVENUE, STATE OF MONTANA,

Defendants and Respondents,

-vs-

ASSOCIATION OF MONTANA RETIRED PUBLIC EMPLOYEES, et al.,

Defendants and Respondents.

FILED

NOV 23 1993

Ed Smith
CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM:   District Court of the First Judicial District,
               In and for the County of Lewis and Clark,
               The Honorable Thomas C. Honzel, Judge presiding.


COUNSEL OF RECORD:

    For Appellants:

        Edmund F. Sheehy, Jr. (argued); Cannon & Sheehy,
        Helena, Montana

    For Respondents:

        David W. Woodgerd, Dep't of Revenue, Helena, Montana
        R. Bruce McGinnis (argued), Tax Counsel, Helena, MT
        Brenda Nordlund (argued), Dep't of Administration,
        Helena, Montana

        Leo Berry; Browning, Kaleczyc, Berry & Hoven, Helena
        Montana (Association of Montana Retired Public
        Employees)

Heard:      April 28, 1993
Submitted:  July 27, 1993
Decided:    November 23, 1993

Filed:

_____
        Clerk

Justice Karla M. Gray delivered the Opinion of the Court.

This is an appeal from the grant of summary judgment to defendants by the First Judicial District Court, Lewis and Clark County. We affirm in part and reverse in part.

We consider the following issues on appeal:

1. Did the District Court err in concluding that no contractual right existed in certain state retirees to continued exemption from taxation of state retirement benefits, and that Ch. 823, 1991 Mont. Laws, does not violate Article II, Sec. 31 of the Montana Constitution?

2. Did the District Court err in concluding that the provision of Ch. 823, 1991 Mont. Laws, phasing out the $3,600 exemption does not violate 4 U.S.C. § 111?

3. Did the District Court err in concluding that the retirement adjustment payment contained in Ch. 823, 1991 Mont. Laws, does not violate 4 U.S.C. § 111?

4. Are the retirement adjustment payment and related implementation provisions severable from Ch. 823, 1991 Mont. Laws?

For many years, the State of Montana exempted from income taxation all retirement benefits paid through its various retirement systems to teachers and state government retirees, while taxing retirement benefits paid by the United States to federal retirees. In 1989, the United States Supreme Court decided Davis v. Michigan Dep't of Treasury (1989), 489 U.S. 803, 109 S.Ct. 1500, 103 L.Ed.2d 891. The Supreme Court determined that 4 U.S.C. § 111 waives the immunity retired federal employees otherwise would enjoy from state taxation of retirement benefits received as a result of their employment with the federal government, except to the extent such state taxation discriminates on the basis of the source of the retirement benefits. Because the Michigan tax at issue favored

2

retired state employees based on the source of their retirement benefits, the Supreme Court concluded that the tax violated principles of intergovernmental tax immunity. Davis, 489 U.S. at 810, 817, 109 S.Ct. at 1505, 1509, 103 L.Ed.2d 901, 906.

Although Davis was decided during Montana's 1989 legislative session, the legislature did not amend Montana's tax laws in response to Davis prior to adjourning. As a result, a group of federal retirees filed a declaratory judgment action to have the existing taxation scheme declared unconstitutional; they also sought a retroactive application of Davis for purposes of entitlement to a refund of taxes illegally collected by the State. By the time that case reached this Court, the district court had adopted the parties' stipulation that the tax was invalid for tax years beginning after December 31, 1988; only the issue of retroactive application of Davis was before us. See Sheehy v. State, Dep't of Revenue (1991), 250 Mont. 437, 820 P.2d 1257.

The Montana legislature subsequently passed Chapter 823, 1991 Montana Laws, which, according to its title, restructures the income tax on pension benefits by equalizing the taxation of all pension benefits. In lieu of extending the total exemption from taxation previously available to state retirement income to federal retirement income, the legislature opted in Chapter 823 to bring all retirement income--including both state and federal pensions--within the Montana income tax. Chapter 823 does exempt from taxation the first $3,600 of all pension and annuity income received, except that the exemption is reduced or phased out by $2

3

for every $1 of federal adjusted gross income in excess of $30,000. In addition, section 5 of Chapter 823 grants to state retirees who are Montana residents, and who now were to be taxed in response to Davis, an annual retirement adjustment payment.

Appellants, who are primarily federal retirees but who include one or more state and teacher retirees (hereafter Taxpayers), filed the instant declaratory judgment action against two state retirement divisions of the Montana Department of Administration and the Montana Department of Revenue (hereafter the State), challenging Chapter 823 on a number of grounds. The Association of Montana Retired Public Employees was allowed to intervene. The parties entered into an agreed statement of facts and submitted the case to the District Court on cross motions for summary judgment.

The District Court granted summary judgment to the State on all issues. Taxpayers appeal from portions of that judgment.

I

Did the District Court err in concluding that no contractual right existed in certain state retirees to continued exemption from taxation of state retirement benefits, and that Ch. 823, 1991 Mont. Laws, does not violate Article II, Sec. 31 of the Montana Constitution?

Taxpayers argue that as to state employees who retired on or before the effective date of Chapter 823 and began receiving retirement benefits at a time when those benefits were fully exempt from taxation, Chapter 823 violates Article II, Section 31 of the 1972 Montana Constitution, which prohibits the legislature from

4

passing any law impairing the obligation of contracts. The thrust of the argument is that, by taxing these retirees' state pensions, Chapter 823 impairs private contractual rights codified at §§ 19-4-706 and 19-3-105, MCA (1989), that exempted their pensions from taxation.

The State counters that the pre-Chapter 823 statutes did not create private contractual rights, and could not create a right in state retirees never to be taxed because it is prohibited from surrendering or contracting away its taxing power by Article VIII, Section 2 of the 1972 Constitution. Thus, the State contends, Article II, Section 31 is inapplicable here.

The District Court correctly relied on Wage Appeal v. Board of Personnel Appeals (1984), 208 Mont. 33, 676 P.2d 194, in concluding that §§ 19-4-706 and 19-3-105, MCA (1989), constituted current policy statements regarding public employment, rather than a contract providing that state retirement benefits would never be taxed. In Wage Appeal, a statewide pay plan was challenged on the basis that it impaired employment contracts entered into before it took effect. We stated:

> [W]hen the Legislature enacts a statute fixing certain terms and conditions of public employment, such as salaries and compensation, it is presumed that the statute does not create contractual rights, but is intended merely to declare a policy to be pursued until the Legislature declares otherwise.

Wage Appeal, 676 P.2d at 199 (citations omitted). While recognizing the "presumption" language in Wage Appeal, Taxpayers rely on additional language therein:

5

> If contractual rights are to be created by statute, the language of the statute and the circumstances must manifest a legislative intent to create private rights of a contractual nature enforceable against the State.

Wage Appeal, 676 P.2d at 199 (citations omitted). Taxpayers assert that the provisions of §§ 19-4-706 and 19-3-105, MCA (1989), clearly manifest legislative intent to create private contractual rights enforceable against the State. We disagree.

Notwithstanding their bald assertion of clearly manifested legislative intent, Taxpayers offer no analysis of the statutes to support the assertion. Thus, it is necessary only to point out that § 19-4-706, MCA (1989), provides that state retirement benefits _are_ exempted from state tax. The use of the present tense "are" indicates that the statute is a statement of current policy regarding public employment. The statute contains no manifestation of legislative intent to create private and enforceable contractual rights as contemplated in Wage Appeal; nor does it make or imply any promises regarding ongoing or future tax treatment of state retirement benefits. Taxpayers have not met their burden under Wage Appeal.

Moreover, Taxpayers' reliance on Clarke v. Ireland (1948), 122 Mont. 191, 199 P.2d 965, and State ex rel. Sullivan v. State (1977), 174 Mont. 482, 571 P.2d 793, as support for their theory that §§ 19-4-706 and 19-3-105, MCA (1989), created a contract right to continued exemption from taxation of state retirement benefits is misplaced. Both cases involved an effort to deny the plaintiffs therein an actual retirement benefit provided by the Teachers' Retirement Act at the time the plaintiffs became members of the

6

teachers' retirement system; our conclusions in <u>Clarke</u> and <u>Sullivan</u> that contract rights existed were based on those facts.

Here, we have no issue concerning efforts to deny or limit state retirees' actual retirement benefits. The question before us relates to a taxation provision entirely separate from state retirement programs and entitlements thereunder. Furthermore, the taxation characteristic which distinguishes this case from <u>Clarke</u> and <u>Sullivan</u> also brings into play Article VIII, Section 2 of the 1972 Constitution, which prohibits the state from surrendering or contracting away the power to tax. Under that constitutional provision, the state cannot promise any group of taxpayers that it will never tax them.

We hold that the District Court correctly concluded that state employees retiring prior to the effective date of Chapter 823 did not have a contractual right to continued exemption from taxation of their state retirement benefits. On that basis, the District Court also correctly determined that Chapter 823 does not violate Article II, Section 31 of the Montana Constitution.

II

Did the District Court err in concluding that the provision of Ch. 823, 1991 Mont. Laws, phasing out the $3,600 exemption does not violate 4 U.S.C. § 111?

Prior to adoption of the Public Salary Tax Act of 1939 (the Act), compensation of both state and federal employees generally was thought to be exempt from taxation by another sovereign under

7

the doctrine of intergovernmental tax immunity. The purpose of the Act was to impose federal income tax on the salaries of all state and local government employees. In order to ensure that federal employees did not remain immune from state taxation while state employees were being required to pay federal income taxes, Congress enacted § 4 of the Act--now 4 U.S.C. § 111--waiving immunity which might otherwise have shielded federal employees from state taxation, but retaining immunity from discriminatory taxation based on the source of the income:

> The United States consents to the taxation of pay or compensation for personal service as an officer or employee of the United States, a territory or possession or political subdivision thereof, the government of the District of Columbia, or an agency or instrumentality of one or more of the foregoing, by a duly constituted taxing authority having jurisdiction, <u>if the taxation does not discriminate against the officer or employee because of the source of the pay or compensation.</u>

4 U.S.C. § 111 (emphasis added).

In 1989, the United States Supreme Court decided <u>Davis</u>, which involved a Michigan income tax system discriminating in favor of state retirees and against federal retirees by exempting only state retirement benefits from taxation. The Supreme Court determined that the discriminatory tax was based on the source of the retirement benefits and was not justified by significant differences between the two classes of retirees. <u>Davis</u>, 489 U.S. at 817, 109 S.Ct. at 1509, 103 L.Ed.2d at 906.

When <u>Davis</u> was decided, it became clear that Montana's income tax statutes regarding state versus federal retirement benefits also violated federal law. In responding to <u>Davis</u> and

8

restructuring the taxation of pension benefits in Chapter 823, the Montana legislature provided a $3,600 exemption from taxation to all retirees; the exemption is phased out beginning at the $30,000 income level. Taxpayers contend that the phase-out violates 4 U.S.C. § 111 by discriminating against federal retirees based on the source of their income. This is so, they contend, because federal pensions are larger than state pensions and, as a result, federal retirees will lose all or part of the exemption. The State contends that the phase-out exemption treats state and federal retirees' pensions equally and that any difference is based on amount, not source, of income.

As discussed above, the controlling federal statute does not prohibit all differences in state taxation of state and federal pensions. Rather, it precludes taxation which discriminates against federal retirees because of the source of the pension. 4 U.S.C. § 111. Here, the phase-out exemption is neutral on its face; it applies to all taxpayers equally. Any difference in impact on federal and state retirees is based entirely on the amount of income received by each individual taxpayer, without regard to the source of that income.

Indeed, the Supreme Court in Davis tacitly approved differences in taxation such as the phase-out exemption before us:

> A taxation exemption truly intended to account for differences in retirement benefits would not discriminate on the basis of the source of those benefits . . . ; rather, it would discriminate on the basis of the amount of benefits received by individual retirees.

Davis, 489 U.S. at 817, 109 S.Ct. at 1508, 103 L.Ed.2d at 906

9

(emphasis added). The phase-out exemption contained in Chapter 823 treats individual retirees differently based on differences in the amount of retirement income received. Taxpayers' strained interpretation that because federal pensions generally are larger than state pensions and, thus, that the phase-out discriminates as to source rather than amount, simply does not square with Davis.

We conclude that the phase-out exemption does not discriminate as to source of income. Therefore, we hold that the District Court correctly concluded that the provision of Chapter 823 phasing out the $3,600 exemption does not violate 4 U.S.C. § 111.


III

Did the District Court err in concluding that the retirement adjustment payment contained in Ch. 823, 1991 Mont. Laws, does not violate 4 U.S.C. § 111?

Observing that Davis does not limit the State's ability to set the terms and conditions of public employment, the District Court concluded that the adjustment constitutes a legitimate increased retirement benefit to state retirees. It relied primarily on Clark v. United States (7th Cir. 1982), 691 F.2d 837.

Taxpayers argue that the adjustment is part of the taxation scheme and that it impermissibly discriminates against them. They also argue that Clark is inapplicable. The State contends that the adjustment is unrelated to the tax and that, pursuant to Clark, it is a valid retirement benefit.

Davis requires a two-pronged analysis of the legislation at

10

issue here: 1) Does it constitute discriminatory taxation against federal retirees or in favor of state retirees on the basis of source of income? and 2) If so, is the different treatment "directly related to, and justified by, 'significant differences between the two classes'"? Davis, 489 U.S. at 816, 109 S.Ct. at 1508, 103 L.Ed.2d at 905 (citation omitted). Application of Davis to the case before us mandates our conclusion that the retirement adjustment payment (hereafter adjustment) contained in section 5 of Chapter 823 violates 4 U.S.C. § 111.

It is clear that the revenue, equalization and adjustment provisions of Chapter 823 are related parts of a comprehensive income tax program encompassing all pension income. The provisions were all included in and part of the same bill, originally introduced as Senate Bill 226 in the 1991 Montana legislature. The title of the bill, subsequently enacted as Chapter 823, reads in pertinent part:

> An Act to Restructure the Income Tax on Pension Benefits by Equalizing the Taxation of All Pension Benefits; To Provide an Exemption of $3,600 from Taxation of Benefits from Federal, State, and Private Retirement, Annuity, Pension, and Endowment Plans or Systems; To Provide That the Amount of the Exemption be Reduced by $2 for Every $1 of Federal Adjusted Gross Income Received by the Taxpayer in Excess of $30,000; To Provide for an Adjustment Payment to Retirees of State, Local, and Teacher Retirement Systems Who are Montana Residents. . . .

Reading the title makes it clear that the overall purpose of this bill was to tax state and federal pensions in a manner that does not violate 4 U.S.C. § 111 as interpreted in Davis. Rather than comply with 4 U.S.C. § 111 by extending the total exemption from state income taxation previously granted to state retirement

11

benefits to include federal retirement benefits, the legislature chose to equalize the burden by taxing all retirement benefits, subject to the phase-out exemption discussed above. Within the same legislative enactment, the legislature provided for an adjustment payment to state retirees who are Montana residents. The State's argument that the two portions of the bill are not related defies logic.

Moreover, the relationship between the tax equalization provisions of the bill, with their negative impacts on state retirees, and the adjustment intended to make up, in part, for that equalization cannot be gainsaid. The adjustment--while purporting to be an adjustment to state retirement benefits--is, in fact, an adjustment to the equalization achieved via the first sections of Chapter 823. This conclusion is inescapable given the inclusion of the adjustment in, and as part of, the tax equalization program. No other interpretation of these two portions of Chapter 823 comports with our duty to construe statutes in a reasonable manner.

It is clear that the adjustment is not an actual and legitimate pension or retirement benefit. If it were a pension benefit, the State would have provided it to all of its retirees in recognition of their years of public service rather than just those living in Montana. There was no need to do so because the sole purpose of the adjustment was to partially recompense state retirees living in Montana for the tax they now must pay under the equalizing provisions of Chapter 823.

Further evidence that the adjustment is not an actual

12

increased retirement benefit for retired state employees is the fact that the funding of the section 5 adjustment bears no resemblance to the funding of actual state retirement benefit adjustments previously enacted by the legislature. Such actual retirement adjustments as those contained in the Public Employees' Retirement System at § 19-3-1603, MCA, and in the Teachers' Retirement System at § 19-20-713, MCA, are funded by investment income produced by the retirement fund made up of employee and employer contributions. See §§ 19-3-1602 and 19-20-712, MCA. Here, the funding for the so-called retirement adjustment payment is statutorily appropriated from the general fund pursuant to section 4 of Chapter 823--that is, from the taxes collected from all Montana taxpayers. The money to pay the adjustment never goes into the state retirement funds, but is simply paid by the state treasurer to the retirement boards, to be distributed by the boards in accordance with the provisions of Chapter 823. While this evidence is not conclusive as to the nature of the adjustment at issue here, it undercuts any notion that the adjustment is a legitimate increase in retirement benefits for state retirees.

We conclude that the adjustment is a partial tax rebate denominated otherwise in an attempt to evade the requirements of federal law. The discriminatory aspect of the adjustment is clear: the adjustment favors state retirees living in Montana based solely on the source of their retirement income; that is, those retirees living in Montana and receiving state retirement income receive the adjustment, while federal retirees living in Montana and receiving

13

federal retirement income do not. Thus, the adjustment constitutes discriminatory taxation based solely on the source of the respective retiree's income, in violation of 4 U.S.C. § 111.

The State's reliance on Clark for the proposition that the adjustment is merely an allowable increased retirement benefit is misplaced. Clark involved a cost-of-living adjustment provided to all federal retirees as an actual and legitimate pension adjustment. Clark, 691 F.2d at 841. Here, the adjustment was provided not to all state retirees, but only to state retirees who are Montana residents. Further, the adjustment provided in Clark was entirely independent of, and unrelated to, any tax provisions. Here, it is part of a tax equalization scheme mandated by federal law.

Because the adjustment contained in section 5 of Chapter 823 violates 4 U.S.C. § 111, the disparate tax treatment of state and federal retirement income is justified only if it is "directly related to, and justified by, 'significant differences between the two classes.'" Davis, 489 U.S. at 816, 109 S.Ct. at 1508, 103 L.Ed.2d at 905. Application of this test mandates the conclusion that the adjustment contained in Chapter 823 cannot stand.

The State makes no real argument that significant differences in fact exist between the two classes of retirees that justify the discriminatory adjustment. Perhaps this is to the State's credit, since it is clear that no such articulable differences exist which could withstand Davis scrutiny. The most obvious contention to be made regarding differences between the classes is the State's

14

interest in inducing and retaining qualified state government workers. While this position is not asserted here, it is precisely the argument made by the state of Michigan in Davis to justify the preferential treatment of its retired employees, and is the argument squarely rejected by the Davis Court:

> This argument is wholly beside the point, however, for it does nothing to demonstrate that there are "significant differences between the two classes" themselves; rather, it merely demonstrates that the State has a rational reason for discriminating between two similar groups of employees. The State's interest in adopting the discriminatory tax, no matter how substantial, is simply irrelevant to an inquiry into the nature of the two classes receiving inconsistent treatment.

Davis, 489 U.S. at 816, 109 S.Ct. at 1508, 103 L.Ed.2d at 905 (emphasis added).

Moreover, no reasonable argument can be made that the adjustment is necessary or intended (a) to retain retired residents in Montana in order to provide a critical mass of retired people to use those services and facilities that are important to retired people; or (b) to entice other retired people into the state. Such arguments would apply to all retired people and would support the similarities between state and federal retirees rather than establishing any significant differences between the two classes.

Here, as noted, the State does not address or attempt to meet the Davis requirement that it justify disparate treatment on the basis of significant differences between the two classes of retirees. The reason is clear: the "adjustment" is not based on any difference in the nature of the two classes before us. The disparate treatment is based entirely on the State's desire to

15

continue to provide an advantage to those of its own retirees losing a pre-_Davis_ advantage--namely, state retirees who reside in Montana and whose state pensions are now subject to income tax pursuant to Chapter 823. While the desire is understandable and perhaps even laudable, it is legally insufficient under _Davis_ as a justification for taxation which discriminates against federal retirees.

We conclude that the adjustment contained in section 5 of Chapter 823 constitutes discriminatory taxation which is not related to, or justified by, significant differences between state and federal retirees. We hold that the District Court erred in determining that the retirement adjustment payment does not violate 4 U.S.C. § 111.

IV

Are the retirement adjustment payment and related implementation provisions severable from Chapter 823, 1991 Mont. Laws?

Having concluded that the adjustment provision contained in section 5 of Chapter 823 violates 4 U.S.C. § 111, it is necessary to determine whether that provision and related implementing provisions can be severed from Chapter 823, or whether the entirety of Chapter 823 must be stricken. We conclude that the invalid provisions can be severed.

Section 20 of Chapter 823 provides that if a part of the legislation is invalid, all valid parts that are severable from the

16

invalid part remain in effect. We previously have concluded that the inclusion of a severability clause is an indication that the drafters desired judicial severability policy to apply. Montana Automobile Assoc. v. Greely (1981), 193 Mont. 378, 399, 632 P.2d 300, 311. Thus, we begin our analysis with stated legislative intent favoring severability. We then apply severability principles in determining whether the invalid provisions can be severed or whether the entire legislative act must be stricken:

> If an invalid part of a statute is severable from the rest, the portion which is constitutional may stand while that which is unconstitutional is stricken out and rejected. . . . A statute "is not destroyed in toto because of an improper provision, unless such provision is necessary to the integrity of the statute or was the inducement to its enactment." . . . If, when an unconstitutional portion of an act is eliminated, the remainder is complete in itself and capable of being executed in accordance with the apparent legislative intent, it must be sustained.

Greely, 632 P.2d at 311 (citations omitted).

Here, the income tax provisions of Chapter 823 clearly are not destroyed in toto by striking the adjustment provisions contained in sections 4 and 5; indeed, they are not impacted in any way. The income tax still may be imposed and the exemption may be given effect without the adjustment for state retirees living in Montana. Nor was the adjustment the inducement for enacting the legislation; the "inducement" for Chapter 823 was 4 U.S.C. § 111 and the Supreme Court's Davis decision.

The income taxes and exemption contained in Chapter 823 remain complete in themselves and capable of being executed in accordance with the overall legislative intent, which was to equalize taxes.

17

Granted, the legislature also intended to continue an advantage for certain state retirees through the adjustment. But where we have invalidated the adjustment portion of Chapter 823, it is clear that the legislature intended, through the severability clause it included in Chapter 823, to preserve all valid parts.

Our earlier determination that the revenue, equalization and adjustment provisions of Chapter 823 are related parts of a comprehensive income tax program encompassing all pension income does not negate our conclusion here regarding severability. The fact that the provisions are related from the standpoint of whether they can withstand 4 U.S.C. § 111 and Davis scrutiny does not mean that they are not, and cannot be, separate and independent from a severability standpoint. From an administrative and operational perspective, it is clear that sections 4 and 5 are segregable from the income tax and exemption provisions.

Finally, and returning again to the legislature's specific intent that invalid portions of Chapter 823 be severed, we note that, absent a severability clause:

> [T]he presumption is against the mutilation of a statute, and that the legislature would not have enacted it except in its entirety. The incorporation of a provision such as section 20 [severability clause] creates a presumption to the contrary; namely, that the legislature would have enacted the law without its invalid portions being incorporated therein.

State v. Holmes (1935), 100 Mont. 256, 291, 47 P.2d 624, 636 (citation omitted). See also Ingraham v. Champion Int'l (1990), 243 Mont. 42, 49, 793 P.2d 769, 773. The presumption operates here in support of the legislature's intent that the remainder of

18

Chapter 823 remains valid even where the adjustment provisions are determined to be invalid. Nothing in Chapter 823 indicates any intent that the tax and exemption provisions are dependent on the validity of the adjustment for state retirees living in Montana; thus, no inconsistency between such a provision and the contrary and clearly-stated severability clause exists in Chapter 823 which might require us to depart from the plain language used by the legislature and delve into the legislative history to resolve the issue before us.

We conclude that sections 4 and 5 are severable from Chapter 823, 1991 Montana Laws. We hold that those sections are severed and excised from Chapter 823 and, with those invalid and severed provisions excepted, Chapter 823, 1991 Montana Laws, remains valid and in full force and effect.

Affirmed in part and reversed in part.

_____
Justice

We concur:

_____
Chief Justice

19

The Honorable Byron L. Robb, Judge
of the District Court, sitting
for Justice John C. Harrison

The Honorable John Warner, Judge of
the District Court, sitting in the
seat vacated by the retirement
of Justice R.C. McDonough

20

District Judge Peter L. Rapkoch specially concurring in part and dissenting in part.

I concur in the majority opinion on Issue I, that state employees retiring before the effective date of Chapter 823, 1991 Laws of Montana, did not have a contractual right to continued exemption from taxation of their state retirement benefits.

I also agree that the provision of Chapter 823 phasing out the $3600 exemption does not violate 4 U.S.C. § 111 (1966).

Nor do I disagree with the majority that the adjustment contained in section 5 of Chapter 823 constitutes discriminatory taxation and therefore violates 4 U.S.C. § 111 (1966).

It is, however, my opinion that the adjustment payment provision is not severable from the rest of Chapter 823, and therefore, I dissent from the majority's opinion on that point.

Section 20 of Chapter 823 is the severability provision here. The incorporation of that provision raises a presumption that the Legislature would have enacted the law without its invalid portions.  Williams v. Standard Oil Co. (1929), 278 U.S. 235, 241-42; State v. Holmes (1935), 100 Mont. 256, 291, 47 P.2d 624, 636; Ingraham v. Champion Int'l. (1990), 243 Mont. 42, 49, 793 P.2d 769, 773.

That is a rebuttable presumption though, and a weak one at that; rebuttable by the nature of the statue being considered: its purpose manifested by its provisions before severance as compared to its apparent purpose, as manifested by the provisions remaining

21

after amputation. Can it be said that the purpose is the same after surgery as it was before?

The majority cites and quotes Montana Automobile Association v. Greely (1981), 193 Mont. 378, 399, 632 P.2d 300, 311 as follows:

> A statute "is not destroyed in toto because of an improper provision, unless such provision is necessary to the integrity of the statue or was the inducement to its enactment." If, when an unconstitutional portion of an act is eliminated, the remainder is complete in itself and capable of being executed in accordance with the apparent legislative intent, it must be sustained. [Citation omitted; emphasis added].

This cannot be done here. "Apparent legislative intent" must be that intent manifested by the language of the statute before severance. It is true that neither the income tax provisions nor the equalization parts are not themselves destroyed or affected by striking the adjustment provisions. But the former cannot in this case be considered separate and apart from the amputated adjustment provision. And "amputated" is the right word. What remains and will be enforced under the majority opinion will not be the same as what clearly appears to be the intent of the Legislature in the original enactment. The Legislature did not, in enacting Chapter 823, set out to do no more than equalize the income tax on all retirees. It went on and set out, by the adjustment provision, to remove or lessen that impact on resident Montana retirees.

The general statement of the severability rule in Greely is an accurate statement. Portions of a statute are severable if:

(1) the invalid part is not necessary to the integrity of the statute; or

22

(2)   the invalid part was not the inducement to its enactment;

(3)   the remainder of the statute is complete in itself; and (conjunctive)

(4) the remainder is capable of being executed in accordance with the apparent legislative intent.   Greely, 632 P.2d at 311.

I submit that the surgery here performed on Chapter 823 fails to meet condition 1 above in that sections 4 and 5, the adjustment provisions, are necessary to the integrity of the entire Chapter 823 as originally enacted.   It is correct that the equalization provisions may be imposed and the exemption given effect without the adjustment to income for Montana resident retirees.   But what would then be imposed and given effect would be a law completely different from what is clearly intended in the original act.   It may even be a better law, but that is not our business; such would be judicial legislation.

It also seems that the adjustment provision is part of an enactment that is a byzantine effort to avoid Davis v. Michigan Department of Treasury (1989), 489 U.S. 803.   I stand in awe and admiration of such effort, but we are subject to 4  U.S.C. § 111 (1966) and Davis and must apply logic to the premises therein set forth.   I, therefore, believe that the adjustment provision is an inseparable inducement to the enactment of Chapter 823, thereby failing the second condition above.

The remainder of the statute, after eliminating the adjustment provision is complete in itself, but only in itself.   It is not

23

what the Legislature enacted or intended. There go conditions 3 and 4 above.

What remains after our decision is not, as stated _ad nauseam_ above, capable of being executed in accordance with the apparent legislative intent. We cannot cut out a third of the legislation where that third completely changes the effect of the whole enactment and say that what is left is what the Legislature started with.

_Greely_ is not on point. There the purpose of the Act was to regulate lobbying. The Legislature indulged in overkill by, for instance, defining the proscribed practice so a person of normal intelligence could not figure out what he could not do. Several sections were therefore held void; others, because the subject matter of some of the sections was not embraced in the title of the Initiative, contrary to Article V, Section 11, Clause 3, of the Montana Constitution.

This Court stated:

> The Initiative, while being lengthy, is basically amendatory in nature. Its purpose was to expand Chapter 7, Title 5, of Montana's Lobbying Act, to provide for the disclosure of money spent to influence action of public officials and to require elected officials to disclose their business interests. _This_ purpose is not frustrated by our limitations of the Initiative. Even after our excisions, Chapter 7, Title 5, as amended by the Initiative is complete in itself and capable of being executed in accordance with the intention of the people of Montana. [Emphasis added].

_Greely_, 632 P.2d at 311-12.

The legislation there considered is of a different nature than Chapter 823, where the parts are meaningful only in internal

24

conjunction with each other. The whole of Chapter 823 was enacted as a unit.

I must disagree with the view expressed that the legislative intent is clearly expressed in section 20, Chapter 823, which is the severability clause, and provides that if a part of the Act is invalid, all invalid parts of the Act are severable, and valid parts remain in effect. This is not the legislative intent that is relevant here. In fact, it is not the legislative intent at all that the act is severable; the intent is that _if_ the act is severable... By use of the word "if" the Legislature recognizes the fact that severance, or declaration of severability is a _judicial_ act, not legislative. If the Legislature had intended the severed statue, it could and should and would have legislated accordingly.

This may, as is stated and shown earlier, raise a presumption that the Legislature would have enacted the law without its invalid portions being incorporated. But that presumption is, I believe, a rebuttable presumption, here rebutted. Also, the inclusion of a severability provision is to _seek_ a _judicial_ act. Before it can be given effect, the _judicial branch_ must do the severing.

The relevant intent for the judiciary to look at in _considering_ severability is not the legislative intent to provide for _severability_, but the legislative intent in _enacting the statute_, the purpose of the statute, as indicated by its provisions. The intent to make portions severable is an interim intention, a procedural means, not the end. This Court has stated:

25

The inclusion of a severability clause in the Initiative is an indication that its drafters and the voters desired this _judicial_ policy [the severability rule] to be applied to the Initiative. [Emphasis added].

Greely, 632 P.2d at 311.

Lastly, section 20, Chapter 823, reads as follows:

Severability. If a part of [this act] is invalid, all valid parts that are _severable_ from the invalid part remain in effect. If a part of [this act] is invalid in one or more of its _applications_, the part remains in effect _in all valid applications_ that are _severable_ from the invalid _applications._ [Emphasis added].

That language, I think, is clear. That section speaks not of physical parts of provisions. It speaks of _applications_ of those parts. To apply the equalization portions without the adjustment portion is to apply the former portions at a divergence of 180 degrees, more or less, from the application intended by the Legislature as the act is presently constituted. A severability clause is an appeal to the judiciary.

It is, therefore, my opinion that the whole of Chapter 823 is invalid and the adjustment provisions are not severable.

District Judge Peter L. Rapkoch,
sitting for Justice William E. Hunt, Sr.


Justice Terry N. Trieweiler joins in the foregoing concurrence and dissent.

Justice

26

Justice Fred J. Weber specially concurs and dissents as follows:

I concur with issues I and II of the majority, but dissent on issues III and IV. Issue III asks if the District Court erred in concluding that the retirement adjustment payment contained in Chapter 823, 1991 Montana Laws, violates 4 U.S.C. § 111. I do not find such discrimination.

The majority states:

It is clear that the revenue, equalization and adjustment provisions of Chapter 823 are related parts of a comprehensive income tax program encompassing all pension income.

I agree that Chapter 823 is a comprehensive income tax program; however, this does not preclude this statute from encompassing other issues. The majority quotes verbatim the "pertinent" part of the bill's title. The first part of the title of the restructuring plan indicates that the legislature attempted to "equalize" the taxes on all pension benefits. Although, listed after this in sequence, the provision indicating the legislature's intent to provide the adjustment payment to State retirees living in Montana is an integral part of the Act as seen by the title's wording:

. . . . To Provide for an Adjustment Payment to Retirees of State, Local, and Teacher Retirement Systems Who are Montana Residents . . . .

It is not necessary to rely upon the title to determine the intent of the legislature. The chapter starts with the following list of seven WHEREAS'S, and with the exception of the taxation of benefits referred to in the first WHEREAS, all of the remaining WHEREAS's set forth an intent directly relating to the adjustment

27

payment and the reasons for the adjustment payment:

> WHEREAS, the State of Montana desires to tax federal, state, and private retirement benefits equally; and
>
> WHEREAS, the State of Montana has in the past provided its employees with a benefit of employment through its tax system; and
>
> WHEREAS, the Legislature desires and encourages qualified employees to enter and remain in public service; and
>
> WHEREAS, it is the policy of the State of Montana to encourage public employees who become superannuated or incapacitated to retire and, to that end, to provide sufficient benefits to provide for retirement; and
>
> WHEREAS, the Legislature wishes to encourage all retired persons to remain within Montana to provide a critical mass of retired persons who use certain services and facilities that are important to retired persons and that may keep and perhaps entice other retired persons into the state; and
>
> WHEREAS, the Legislature has in the past granted increases in retirement benefits in a manner designed to provide relatively greater increases to those retirees who were employed during the years of low wages and whose benefits are relatively small; and
>
> WHEREAS, the Legislature therefore grants an increase in benefits to its former public employees who are residents of the state to provide compensation to encourage them to remain in Montana.

(Emphasis added.)

The above statement of intent was added because the legislature knew that the Davis decision mandated that all pension holders must be taxed equally. The Act does that. At the same time, the legislature knew that such an increase in taxes on State pensions could create a situation where many retirees would leave the State. Acting through its legislature and governor, Montana as a sovereign and as an employer expressed a desire to provide an incentive for Montana retirees to remain in the State. Without subterfuge of any

28

type the legislature declared this intent. Unfortunately, that openness appears to have been a basis for the majority to conclude there was discrimination.

If the same adjustment payment provided in the Act were provided in another act in some future year, and denominated a cost of living, no one would even raise the discrimination argument. I do not find a basis to condemn the adjustment merely because it is included with the tax.

The adjustment payment is paid to State retirees who already are receiving retirement benefits. I find nothing in the record which demonstrates a corresponding obligation by the State of Montana to make some sort of payment to federal retirees whose retirement benefits are paid by the United States. I do not understand how the payment by the State to its retirees can lead to a "clear" determination of discrimination, as compared to a federal increase to federal retirees which would not be such discrimination.

The fact that federal retirees do not get this adjustment is not discrimination as to source. The same adjustment is not given to private retirees either.

The basic intent of 4 U.S.C. § 111 has been lost. That intent is that the income taxation of Montana should tax federal and State retirement benefits at the same rates. The Act does that. An increase in pay to encourage State retirees to remain in the state is not discrimination as contemplated in § 111. An incentive to stay is not discrimination as to source. There is a recognition on

29

the part of the legislature that the new tax on Montana public employee pensions might cause them to leave the State. Such a recognition, stated up front and in the open, does not equal the discrimination that the majority characterizes as "clear."

The fact that this adjustment payment comes from the general fund is also of no consequence. Any other cost of living increase for State public employees comes from the same source. This adjustment payment is no different than any other benefit which the State as an employer has a right to offer a group of its retirees.

The majority refers to § 19-20-713, MCA, which provides a cost of living increase for teachers in the Teachers' Retirement System. The title of Chapter 658 of Montana Laws 1985 shows that only "certain" teachers within the retirees from this system would be benefitted by the increase. I do not understand how the majority condemns the 1991 Act because it is made applicable to "certain" retirees and yet refers to the Teachers' Retirement Act as nondiscriminatory where it also benefits only "certain" teacher retirees.

In addition, the Teachers' Retirement Act uses the "general fund" as the source of funds with which to pay teachers who retired from the various units of the University System and other schools, stating:

> If the employer is the superintendent of public instruction, a public institution of the state of Montana, a unit of the Montana university system, or the Montana state school for the deaf and blind, the legislature shall appropriate to the employer an adequate amount to allow payment of the employer's contribution. (Emphasis added.)

30

Section 3, amended § 19-20-605(3), MCA. With this annuity type system, the employers' part of the cost of living increase for "certain" retirees is paid by the State of Montana. How is that different from the present Act?

I conclude there is no discrimination "as to source" within the 1991 Act. As a matter of policy, Montana provides its own retirees an "incentive" without an intention to discriminate in any manner.

The Davis test of significant differences between the classes is not even reached here. One only has to determine the significant difference between classes if discrimination has occurred. Here, there is no agreement as to even what the appropriate classes are. The only classes that are pertinent to 4 UCS § 111 are "state retirees" and "federal retirees." Both of these classes are taxed equally under this Act. It is only the segment of State retirees that receive the benefit.

While the majority merely mentions that the discrimination is "clear" it does not go on to explain how the "incentive" or "adjustment" is discriminatory. Nor does it explain how the Davis quote applies to what we have before us:

> Under our precedents, "[t]he imposition of a heavier tax burden on [those who deal with one sovereign] than is imposed on [those who deal with the other] must be justified by significant differences between the two classes. (Emphasis added.)

Davis, 489 U.S. at 815-816. The federal retirees have no heavier "tax burden" than do State retirees. The tax burden on both State and federal retirees is identical. The exemption of $3,600 is

31

identical as are the tax rates applicable to both State and federal retirees. The range at which the exemption begins is $30,000 for both State and federal retirees. The only difference is that State retirees who reside in Montana are given an "incentive" to stay within the State that has employed them and from whom their pensions are derived. I point out here that the "incentive" is still subject to tax at the same rates as any amounts received by the retirees.

The District Court determined that the adjustment was part of a policy decision on the part of the State toward its employees. I would affirm the court on this analysis. The State acting as an employer has every right to act in concert with the sovereign and the legislature to provide an incentive to retired public employees to stay within the State that has been their home for years. This policy decision does not constitute discrimination against the retirees of any other sovereign or any other group of retirees. In this case, the other sovereign's retirees are taxed identically with those of the State sovereign. I conclude that instead of condemning the legislature and the governor for their openness in enacting the Act, they should be commended for the forthright way in which this was done.

I also disagree with the conclusion that the adjustment is severable from the Act. Both the title and the statement of intent make it obvious that the adjustment or incentive to stay in Montana is an integral part of this Act. The incentive, based upon the fact that public retirees will now be receiving less money because

32

of the mandatory taxation, should not be divorced from the tax plan itself. The tax plan explains why the employer State of Montana is granting this incentive. I do not believe the intention of granting some additional monies can be divorced from the taxation which applies to the retiree benefits and the adjustment. As demonstrated clearly in the WHEREAS clauses at the beginning of the Act, the taxation and the granting of the adjustment are not severable. The action of the majority is punitive in nature, taxing all benefits equally while eliminating the additional benefit awarded under the Act.

I also concur in the portion of Judge Rapkoch's concurrence and dissent in which he concludes that the adjustment payment is not severable from the rest of Chapter 823.

_____
Justice

33

November 23, 1993

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that the following order was sent by United States mail, prepaid, to the following named:

Edmund F. Sheehy, Jr.
Cannon & Sheehy
P. O. Box 5717
Helena, MT 59604

Hon. Joseph P. Mazurek, Attorney General
Clay R. Smith, Solicitor
215 N. Sanders, Justice Building
Helena, MT 59620

David W. Woodgerd
Department of Revenue
Mitchell Building
Helena, MT 59620

R. Bruce McGinnis
Tax Counsel
Mitchell Building
Helena, MT 59620

Brenda Nordlund
Attorney General's Office
Justice Building
Helena, MT 59620

Leo Berry
Browning, Kaleczyc, Berry & Hoven
P. O. Box 1697
Helena, MT 59624

ED SMITH
CLERK OF THE SUPREME COURT