No. 01-815

IN THE SUPREME COURT OF THE STATE OF MONTANA

2003 MT 48

KAREN FINKE, ANDY J. HUDAK, SCOTT POWERS, CITY OF BILLINGS,
CITY OF BOZEMAN, CITY OF COLUMBIA FALLS, CITY OF KALISPELL,
CITY OF MISSOULA, CITY OF WHITEFISH,
                    Plaintiffs,
        v.

STATE OF MONTANA, ex rel.  MIKE McGRATH, ATTORNEY GENERAL
and WENDY KEATING, ACTING DIRECTOR, MONTANA DEPARTMENT
OF LABOR AND INDUSTRY, YELLOWSTONE COUNTY, GALLATIN
COUNTY, FLATHEAD COUNTY, and MISSOULA COUNTY,
                    Defendants,

RICHARD ROSSIGNOL and R. STEPHEN WHITE,
                    Intervenors-Defendants,
DANIEL W. "DAN" McGEE and BRUCE T. SIMON,
                    Amici Curiae-Defendants.


APPEAL FROM:    In the Supreme Court of the State of Montana
                Original Proceeding--Declaratory and Injunctive Relief
                In and for the County of Yellowstone
COUNSEL OF RECORD:
            For Plaintiffs:
                Stanley T. Kaleczyc, Kimberly A. Beatty, Browning, Kaleczyc, Berry
                & Hoven, Helena, Montana
            For Defendants:
                Mike McGrath, Montana Attorney General, Brian M. Morris, Solicitor,
                Helena, Montana; Eric Fehlig, Montana Department of Labor, Helena,
                Montana; Dennis Paxinos, Yellowstone County Attorney, Mark A.
                English, Deputy Yellowstone County Attorney, Billings, Montana;
                Marty Lambert, Gallatin County Attorney, Bozeman, Montana; Edward
                J. Corrigan, Flathead County Attorney, Jonathan B. Smith, Deputy
                Flathead County Attorney, Kalispell, Montana; Fred Van Valkenburg,
                Missoula County Attorney, Missoula, Montana; Stephanie Oblander, Gregory
                G. Smith, Smith & Oblander,         Great Falls, Montana (Intervenors
Rossignol                    & White)
            For Amicus:
                Daniel McGee, Laurel, Montana (*pro se*); Bruce Simon, Billings, Montana
                (*pro se*)


                                            Heard: May 30, 2002
                                         Submitted: June 6, 2002
                                         Decided:  March 18, 2003

Filed:

_____
                        Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1 This is an original proceeding in which three individual electors and six municipal governments seek a declaratory judgment on the constitutionality of Senate Bill 242 (SB 242). We strike SB 242 in its entirety for the reasons set forth below.

## ISSUES

¶2 Restated, the issues presented to this Court are:

1. Whether the election provisions of SB 242 limiting participation to "record owners of real property" are unconstitutional;

2. Whether the unconstitutional provisions are severable from the constitutional provisions of SB 242; and

3. Whether Plaintiffs are entitled to recover attorneys' fees and costs under the Private Attorney General Doctrine.

## FACTUAL AND PROCEDURAL BACKGROUND

¶3 Since 1966, Montana law has authorized Montana cities and towns to exercise building code jurisdiction over contiguous areas within four and one-half miles of the city limits. Section 69-2105, RCM (1947). This four and one-half mile area became known as the "donut area" or "donut jurisdiction." To obtain donut jurisdiction, an interested municipality must request, in writing, authorization from the applicable state agency, currently the Department of Commerce. Once granted, the municipality may then impose and enforce municipal building codes on construction that takes place in the donut area. Section 50-60-101(11), MCA (1999).

¶4 In the 2001 Montana Legislative Session, the Legislature enacted and the Governor

2

signed into law SB 242. The purpose of SB 242 was to limit municipal building code jurisdiction to the area <u>within</u> the limits of an incorporated city or town, and to allow the county or state--as opposed to the city--to exercise building code jurisdiction over all areas outside the municipal boundaries. To effectuate this outcome, Section 2 of SB 242 redefined "municipal jurisdictional area" to mean "the area within the limits of an incorporated municipality." "Municipal jurisdictional area" (MJA) had formerly been defined as the area within the limits of the incorporated municipality unless that area was extended by written request to include, among other things, "all or part of the area within 4 ½ miles of the corporate limits of a municipality." Section 50-60-101(11), MCA (1999). In other words, prior to SB 242, an MJA included all the area within the city limits plus the donut area. Section 2 of SB 242 eliminated from the definition the donut area.

¶5 SB 242 also established a definition for "county jurisdictional area" (CJA), which includes, "the entire county, or an area or areas within the county, designated by the board of county commissioners as subject to the county building code, excluding any area that is within the limits of an incorporated municipality." SB 242, § 2(6). Moreover, it established a procedure for designating a CJA either by the board of county commissioners or by petition. It also established an election procedure under which a CJA could be created. SB 242, §§ 4,7, and 6 respectively. According to the election procedure, elections were limited to "record owners of real property" (RORPs) rather than to the general constituency. SB 242, § 6.

¶6 In keeping with its purpose to eliminate MJAs, SB 242 established an election

3

procedure under which MJAs could be terminated. As with the election procedures to create CJAs, this termination election was limited to RORPs also. SB 242, § 8.

¶7    The individual Plaintiffs in this case are Karen Finke, Andy Hudak, and Scott Powers, none of whom own real property in their respective MJAs, but all of whom otherwise qualify as eligible voters. The municipal Plaintiffs are the cities of Billings, Bozeman, Columbia Falls, Kalispell, Missoula and Whitefish. Each of these cities previously sought and obtained authorization to create MJAs and to exercise building code jurisdiction over their respective donut areas. We will refer to the Plaintiffs as a group as "Finke." When necessary, we will refer to them as Individual Plaintiffs, meaning Finke, Hudak and Powers, or Municipal Plaintiffs, meaning the six cities listed above.

¶8    The Defendants in this action are the State of Montana, through the Attorney General, the Department of Labor and Industry (DOLI), and Yellowstone, Gallatin, Flathead and Missoula Counties. These County Defendants are the counties in which the Municipal Plaintiffs are located. The State, through the Attorney General, has the duty to defend the constitutionality of the statute. The DOLI is the state agency responsible for administering building codes outside of MJAs. The County Defendants are responsible for conducting the elections and other procedures mandated by SB 242 for determining whether the state, county or municipality will have jurisdiction over building codes.

¶9    In November, 2001, Finke filed a complaint challenging SB 242 and seeking 1) declaratory and injunctive relief; 2) a temporary restraining order; 3) a preliminary injunction; and 4) an expedited hearing. On November 20, 2001, this Court issued an Order

4

temporarily enjoining the County Defendants from passing any resolution under SB 242, conducting elections pursuant to SB 242, or enforcing any provision of SB 242. In addition, the DOLI was temporarily enjoined from asserting state building code jurisdiction within the donut areas of the Municipal Plaintiffs.

¶10 On December 18, 2001, we issued a preliminary injunction in favor of Municipal Plaintiffs, pending the outcome of the case on the merits. The previously-entered temporary injunctions against the County Defendants and DOLI continued as preliminary injunctions as a result of that Order. Additionally, we granted permission for Richard Rossignol and R. Stephen White to intervene. Rossignol and White are each in the construction industry in their respective donut areas of Missoula and Bozeman.

¶11 On February 12, 2002, we granted permission for Daniel W. McGee and Bruce T. Simon to participate as amici curiae. McGee and Simon are registered voters and taxpayers in Yellowstone County. Moreover, McGee was a sitting Montana representative and served as Speaker of the House during the legislative session in which SB 242 was enacted. Simon owns real property in the donut jurisdictional area of the City of Billings and also actively participated in the enactment of SB 242.

¶12 This Court heard oral argument on this matter on May 30, 2002.

## DISCUSSION

¶13 The first issue we address is whether the election provisions of SB 242 limiting participation to RORPs are unconstitutional. Interestingly, not only do the Plaintiffs argue that these provisions are unconstitutional, but Defendant Yellowstone County and *Amici*

5

McGee and Simon also agree that these provisions are, in part or *in toto*, unconstitutional.

¶14 The election provisions of SB 242 are challenged on several constitutional grounds-- as violations of Article II, §§ 4, 13 and 17 and Article V, § 11(3) of the Montana Constitution, and as violations of the Fifth and Fourteenth Amendments of the U. S. Constitution. Article II, § 4 of the Montana Constitution guarantees equal protection of the laws; Article II, § 13 guarantees the unencumbered right of suffrage, and Article II, § 17 guarantees due process of law. Article V, § 11(3) requires that each bill contain only one subject that is clearly expressed in its title. The Fifth and Fourteenth Amendments of the U.S. Constitution guarantee that no person shall be deprived of life, liberty or property without due process of law. Additionally, the Fourteenth Amendment guarantees all persons equal protection of the laws.

¶15 This Court has noted that "[b]ecause voting rights cases involve a fundamental political right, the [U. S.] Supreme Court generally evaluates state legislation apportioning representation and regulating voter qualifications under the strict scrutiny standard." *Johnson v. Killingsworth* (1995), 271 Mont. 1, 4. 894 P.2d 272, 273 (citing, *among others, Kramer v. Union School District* (1969), 395 U.S. 621, 626-27, 89 S.Ct. 1886, 1889, 23 L.Ed.2d 583, 589). "Under that standard, [suspect] legislation is '**unconstitutional** unless the State can demonstrate that such laws are "necessary to promote a compelling governmental interest".'" *Johnson*, 241 Mont. at 4, 894 P.2d at 273-74 (citing *Dunn v. Blumstein* (1972), 405 U.S. 330, 342, 92 S.Ct. 995, 1003, 31 L.Ed.2d 274, 284) (emphasis added).

6

¶16    In *Kramer*, the United States Supreme Court reviewed a law limiting the right to vote in school district elections to property owners or parents of children enrolled in the local public schools.  In *Kramer*, appellant neither owned property nor had children but was otherwise qualified to vote, meeting the age, citizenship and residency requirements. Appellant challenged the law as a violation of the Equal Protection Clause of the U.S. Constitution.  He argued that he and members of his class had a substantial interest in and were affected by school-related decisions and that all members of the community had an interest in the quality and structure of public education.

¶17    The U.S. Supreme Court, in its analysis, stated:

> Statutes granting the franchise to residents on a selective basis always pose the danger of denying some citizens any effective voice in the governmental affairs which substantially affect their lives.  Therefore, if a challenged statute grants the right to vote to some [citizens] and denies the franchise to others, the Court must determine whether the exclusions are necessary to promote a compelling state interest.

*Kramer*, 365 U.S. at 626-27 (citation omitted).

¶18    The *Kramer* Court held that the challenged law did "not meet the exacting standard of precision . . . require[d] of statutes which selectively distribute the franchise."  *Kramer*, 395 U.S. at 632.  It held that the law permitted the inclusion of many persons who had only a remote and indirect interest in school affairs and excluded others who had a distinct and direct interest, and therefore violated the Fourteenth Amendment granting equal protection to all citizens.  *Kramer*, 395 U.S. at 632 and 626.  *See also Phoenix v. Kolodziejski* (1970), 399 U.S. 204, 90 S.Ct. 1990, 26 L.Ed.2d 523 (restriction allowing only property owners to

7

vote for the approval of municipal general obligation bonds held unconstitutional); *Hill v. Stone* (1975), 421 U.S. 289, 95 S.Ct. 1637, 44 L.Ed.2d 172 (unconstitutional to limit franchise for bond election solely to owners of taxable property).

¶19　There are circumstances, however, under which franchise limitation is lawful and constitutional.　This Court, taking its lead from the U.S. Supreme Court, has recognized "that, in the event of a special-purpose unit of government whose functions affect a distinct group of citizens more than other citizens, a state might be allowed to give greater influence to those citizens most affected."　*Johnson*, 271 Mont. at 4, 894 P.2d at 274 (citing *Avery v. Midland County* (1968), 390 U.S. 474, 88 S.Ct. 1114, 20 L.Ed.2d 45).　This has been interpreted to allow franchise limitation in "special interest" elections as opposed to "general interest" elections.　*Avery*, 390 U.S. 474; *Sayler Land Co. v. Tulare Water District* (1973), 410 U.S. 719, 93 S.Ct. 1224, 35 L.Ed.2d 659; *Holt Civic Club v. Tuscaloosa* (1978), 439 U.S. 60, 69, 99 S.Ct. 383, 58 L.Ed.2d 292.　Intervenors Rossignol and White argue, *inter alia*, that a determination of whether SB 242 elections are "special interest" or "general interest" elections requires a factual record that does not exist in this case since this is an original proceeding.　Alternatively, they argue that SB 242 elections are "special interest" elections justifying limiting voters to RORPs.　They assert that the Building Codes Division of the Montana DOLI is a special-purpose unit of the government and that the enforcement of building codes disproportionately affects property owners.

¶20　In a similar vein, the State argues that a franchise limitation such as that found in SB 242 does not necessarily violate equal protection principles.　It maintains that under *Lockport*

8

*v. Citizens for Community Action* (1977), 430 U.S. 259, 97 S.Ct. 1047, 51 L.Ed.2d 313, the election provisions of SB 242 constitute limited referenda and, as a result, the Court must determine the extent to which genuine differences in the relevant interests of those enfranchised and those excluded supports the contested statutory voting classification. *Lockport*, 430 U.S. at 268. As did Intervenors, the State argues that this Court lacks sufficient facts, in the absence of a district court record, to evaluate whether the franchise limitation of SB 242 violates equal protection.

¶21 We disagree. First, we conclude that the application and enforcement of building codes is an issue of public safety that affects all persons living in the affected area, not only record owners of real property. Second, the governmental entity overseeing building codes, whether state, county or municipal, is not such a special-purpose unit that its functions and actions exclusively or disproportionately affect record owners of real property over other constituents living in the area but not owning property. Third, we conclude that elections to determine who may impose and enforce building codes in a given area are general interest rather than special interest elections. This being so, a law restricting the franchise may be upheld only upon the State showing a compelling interest. *Kramer*, 395 U.S. 621. The State has failed to make such a showing in this case.

¶22 In addition to the franchise limitations set forth in the election provisions of SB 242, there are numerous internal inconsistencies in this law. First, Section 8 establishes procedures pertinent to retaining and continuing municipal jurisdictional areas "as provided by law" under the statute. Section 2, however, completely eliminates "municipal

9

jurisdictional areas" by definition.  It is inconsistent to provide that MJAs continue to exist by law when in the same law they have been eliminated.  Second, the term "record owners of real property" is continuously used in SB 242 but is not defined, whereas "owner of real property" is also used.  It is defined to include assignees, lessees and corporations in control of a building, *i.e.*, persons who are disenfranchised under this law because they are not record owners of property.  While not unconstitutional *per se*, these and other inconsistencies create a muddled, confusing law which could potentially result in the denial of other constitutional guarantees, such as due process.

¶23     In sum, we conclude that the election provisions of SB 242 disenfranchise constituents who are not RORPs in violation of the Montana and the U.S. Constitutions.

¶24     We next consider whether the unconstitutional provisions of SB 242 are severable from the remainder of the Bill.   If so, the constitutional portions of SB 242 survive; if not, the entire law must be stricken.

¶25     When a law contains both constitutional and unconstitutional provisions, to determine whether the unconstitutional provisions are severable, we examine the law itself for the existence of a severability clause.  If there is no such clause, we must determine whether the unconstitutional provisions are necessary for the integrity of the law or were an inducement for its enactment.  *Hill v. Rae* (1916), 52 Mont. 378, 389-90, 158 P. 826, 831; *State v. Fire Department Relief Association, etc.* (1960), 138 Mont. 172, 178,  355 P.2d 670, 673; *Sheehy v. Public Employees Retirement Div. (*1993), 262 Mont. 129, 141, 864 P.2d 762, 770.

¶26     This Court has previously held that the "inclusion of a severability clause is an

indication that the drafters desired judicial severability policy to apply." *Sheehy*, 269 Mont. at 141, 864 P.2d at 770 (citation omitted). SB 242 does not contain a severability clause, so we must determine whether the integrity of SB 242 relies upon the unconstitutional provisions or whether the inclusion of these provisions acted as inducement to its enactment. Moreover, the remainder of the statute, if and when the unconstitutional provisions are severed, must be complete in itself and capable of being executed in accordance with the apparent legislative intent. *Sheehy*, 262 Mont. at 141, 864 P.2d at 770 (citation omitted).

¶27 The legislative history of the statute demonstrates that SB 242 was revised and rejected on several occasions during the 2001 legislative session, and passed only after the final revision which added, among other sections, the election provisions at the heart of this case. Finke argues that the inclusion of these election provisions served as the inducement for enactment and are necessary to the integrity of the law. Defendant Yellowstone County and the State argue that the passing of the law immediately after the inclusion of the unlawful election provisions does not necessarily indicate a causal relation. The State maintains that §§ 1, 6, and 8 of SB 242 can be severed and the remainder of SB 242 "remains complete and capable of being executed in accordance with the overall legislative intent."

¶28 We find it significant that the revisions to SB 242 that we have held are unconstitutional were added just prior to legislative acceptance of the bill. Moreover, and contrary to the State's argument that only §§ 1, 6 and 8 of SB 242 (the election provisions) would require severing, we conclude that §§ 1, 2, 4, 6, 7 and 8 all contribute to constitutional

11

violations of equal protection. Section 2 redefines "municipal jurisdictional area" in a manner that effectively eliminates MJAs. Section 4 establishes the procedure for designating a CJA and states that upon receipt of written protests by ten percent of the "owners of real property," elections under Section 6 must take place. Section 6, however, requires elections to take place if ten percent of "record owners of real property" have submitted written protests to the proposed CJA. Section 7 allows for the adoption of a CJA by petition circulated among RORPs only. Therefore, we are compelled to conclude that §§ 1, 2, 4, 6, 7, and 8 are clearly interrelated and essential to the integrity of SB 242, and that §§ 6, 7, and 8 contributed as the inducement for the enactment of SB 242. Therefore, we conclude these provisions are not severable. As a result, SB 242 must be stricken in its entirety.

¶29 Lastly, Finke argues that Plaintiffs are entitled to recover attorneys' fees and costs under the private attorney general doctrine (Doctrine).

¶30 The State of Montana "adheres to the 'American Rule' regarding attorneys' fees. Under the American Rule, a party in a civil action is generally not entitled to fees absent a specific contractual or statutory provision." *Matter of Dearborn Drainage Area* (1989), 240 Mont. 39, 42, 782 P.2d 898, 899 (citation omitted). We have noted equitable exceptions to this Rule, however, including the exception argued by Finke--the private attorney general exception. *School Trust v. State ex rel. Bd. Of Com'rs*, 1999 MT 263, 296 Mont. 402, 989 P.2d 800.

¶31 There are three basic factors to be considered in awarding attorneys' fees under this Doctrine: 1) the strength or societal importance of the public policy vindicated by the

12

litigation; 2) the necessity for private enforcement and the magnitude of the resultant burden on the plaintiff; and 3) the number of people standing to benefit from the decision. *School Trust*, ¶ 66. We have stated previously that this Doctrine is primarily used "when the government, for some reason, fails to properly enforce interests which are significant to its citizens." *Dearborn*, 240 Mont. at 43, 782 P.2d at 900.

¶32 In arguing that the private attorney general doctrine applies in this case, Finke maintains that this Court in assuming original jurisdiction of this matter recognized in its Order that "constitutional issues of state-wide importance are . . . involved." Finke further argues that unless the disenfranchised electors and the affected municipalities brought this challenge, the unconstitutional elections would have been held and SB 242 would have stood unchallenged. Lastly, Finke argues that because the issues in this case involve the electorate at large, the citizens of Montana stand to benefit from the decision in this case.

¶33 Defendant Yellowstone County advances several arguments against the award of attorneys' fees in this case, but the one we find most persuasive is that it would be unjust to force the Counties to pay for the unconstitutional actions of the Legislature. The award of attorneys' fees, when not statutorily mandated, is within the discreet and inherent equitable powers of the judiciary. *School Trust,* ¶¶ 64 and 68 (citations omitted). While under the private attorney general doctrine, it may be considered equitable to award attorneys' fees to Finke, we conclude that the inequity of imposing those fees against the Defendant Counties who neither fashioned nor passed the unconstitutional law is overriding.

¶34 The only entity remaining against whom fees could be assessed is the State of

13

Montana. The claim against the State in the case at bar is for injunctive relief against enforcement of SB 242. The Plaintiffs did not specifically seek attorneys' fees from the State, and the claim for injunctive relief simply does not provide a basis for the imposition of attorneys' fees against the State. In fact, the only potential liability of the State for fees would lie for the actions of the Legislature in enacting an unconstitutional bill, as it is the enactment of SB 242 that prompted the filing of this action. However, § 2-9-111, MCA, provides that the Legislature, as a governmental entity, is immune from suit for any legislative act or omission by its legislative body. There is, therefore, no avenue whereby attorneys' fees could be imposed against the State in this matter.

¶35   Finke's request for attorneys' fees is therefore denied.

/S/ PATRICIA COTTER


We Concur:

/S/ KARLA M. GRAY
/S/ JAMES C. NELSON
/S/ JIM REGNIER
/S/ TERRY N. TRIEWEILER
/S/ W. WILLIAM LEAPHART

/S/ JEFFREY M. SHERLOCK
District Court Judge Jeffrey M. Sherlock
sitting for Justice Jim Rice