

DA 12-0343

IN THE SUPREME COURT OF THE STATE OF MONTANA

2013 MT 243

L. REED WILLIAMS,

        Plaintiff and Appellee,

   v.

BOARD OF COUNTY COMMISSIONERS OF MISSOULA COUNTY,
the governing body of the County of Missoula, acting by and
through Michele Landquist, Bill Carey and Jean Curtiss,

        Defendants and Appellees,

LIBERTY COVE, INC., PAUL ROSSIGNOL, NORMA ROSSIGNOL,
and PONDEROSA DEVELOPMENT, INC.,

        Intervenors and Appellants.

APPEAL FROM:    District Court of the Fourth Judicial District,
In and For the County of Missoula, Cause No. DV-10-673
Honorable Karen Townsend, Presiding Judge

COUNSEL OF RECORD:

        For Intervenors and Appellants:

            Cory R. Gangle (argued); Gangle Law Firm, P.C.; Missoula, Montana

        For Appellee L. Reed Williams:

            Timothy M. Bechtold (argued); Bechtold Law Firm, PLLC;
Missoula, Montana

        For Appellee Missoula County:

            Fred Van Valkenburg; Missoula County Attorney; D. James McCubbin
(argued); Deputy County Attorney; Missoula, Montana

        For Amicus Land Use Clinic:

            Michelle Bryan Mudd, Benjamin S. Sudduth (argued); University of
Montana School of Law; Missoula, Montana

For Amicus State of Montana:

Timothy C. Fox; Montana Attorney General; Lawrence Vandyke (argued); Montana Solicitor General; Helena, Montana

Argued: April 17, 2013
Submitted: April 23, 2013
Decided: August 28, 2013

Filed:

_____
Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1     Liberty Cove, Inc., Paul and Norma Rossignol, and Ponderosa Development, Inc. (collectively "Landowners") utilized the protest provision of § 76-2-205(6), MCA, to block the Board of County Commissioners of Missoula County (Commissioners) from establishing a special zoning district north of Lolo, Montana.  L. Reed Williams (Williams) challenged the constitutionality of § 76-2-205(6), MCA, by filing a complaint against Commissioners in Montana's Fourth Judicial District Court, Missoula County, seeking declaratory and injunctive relief.  Landowners intervened in the action at the District Court and now appeal from the District Court's order denying their motion to dismiss and granting summary judgment to Williams and Commissioners.  We affirm.

## ISSUES

¶2     We restate the four issues raised by Landowners on appeal as follows:

¶3     1.  Did the District Court abuse its discretion in denying Landowners' motion to dismiss Williams' complaint for failure to join them as necessary parties under the Montana Uniform Declaratory Judgments Act?

¶4     2.  Did the District Court err in determining that § 76-2-205(6), MCA, was an unconstitutional delegation of legislative power?

¶5     3.  Did the District Court err in determining that § 76-2-205(6), MCA, was an unconstitutional violation of the right to equal protection and the right to suffrage?

¶6     4.  Did the District Court err when it ruled that § 76-2-205(6), MCA, was severable from the remainder of the statute?

## FACTUAL AND PROCEDURAL BACKGROUND

3

¶7    On September 8, 2009, Commissioners and the Lolo Community Council held a joint public meeting to solicit public testimony concerning the development of a zoning proposal for an area north of Lolo, Montana. Public testimony at this meeting indicated that support existed for the development of a zoning proposal. Following the joint public meeting, Commissioners directed their staff to work with residents and landowners to create a proposal to replace the North Lolo Interim Zoning Plan. Three draft alternative plans were presented at public meetings on January 30, February 3, and February 9, 2010. Based on comments received on the alternative plans and additional staff review, Commissioners issued the Planning Board Public Hearing Draft on February 25, 2010, for public comment.

¶8    The proposed North Lolo Rural Special Zoning District consisted of 422 acres of land north of Lolo and west of U.S. Highway 93. Agricultural and forest land comprised 223 acres in the district. Prior to 2008, this area had been unzoned. On May 30, 2008, Commissioners enacted interim zoning to address public health and safety issues associated with a gravel mining and asphalt production operation proposed by Liberty Cove, Inc., who is one of the parties referred to as Landowners in the instant case. We previously upheld these interim zoning regulations as lawful in *Liberty Cove, Inc. v. Missoula County*, 2009 MT 377, 353 Mont. 286, 220 P.3d 617.[1] Commissioners

---

[1] Liberty Cove challenged the interim zoning on three grounds: (1) Whether the District Court erred in concluding there was an emergency to justify interim zoning; (2) Whether the District Court erred in concluding that Missoula County gave proper notice before adopting interim zoning; and (3) Whether the District Court erred in concluding that the interim zoning adopted by Missoula County did not constitute illegal reverse spot zoning. We affirmed the District Court on all three issues and upheld the interim zoning.

4

extended the one-year interim zoning in 2009, but the interim zoning was set to expire on May 30, 2010. The proposed North Lolo Special Zoning District would have replaced the interim zoning and continued to prohibit sand and gravel mining and concrete and asphalt operations within the district.

¶9 Legal notice concerning the North Lolo Growth Policy Amendment and North Lolo Rural Special Zoning District was published on multiple occasions in Missoula newspapers, posted in five locations, mailed to property owners in and near the proposed district, and emailed to interested members of the public in the Lolo area. The Missoula Consolidated Planning Board held public hearings on March 16 and 23, 2010, and recommended approval of the proposed zoning amendment and special zoning district to Commissioners on a 5 to 1 vote.

¶10 On April 7, 2010, Commissioners held a public hearing and passed "A Resolution of Intention to Adopt Amendments to the 2002 Lolo Regional Plan as an Amendment to the Missoula County Growth Policy 2005 Update." Commissioners published notice in accordance with § 76-2-205(5), MCA, on April 15, 2010. The publication included notice that the written protest period provided for in § 76-2-205(6), MCA, would expire in 30 days. Section 76-2-205(6), MCA, is a protest provision that allows landowners to prevent the board of county commissioners from adopting a zoning resolution when protests are received from one of the following two groups: (1) 40 percent of the real property owners within the district; or (2) real property owners representing 50 percent of property taxed for agricultural purposes or as forest land in the district. When a successful protest is received, it prevents the board of county commissioners from

5

proposing any further zoning resolutions with respect to the subject property for one year. Section 76-2-205(6), MCA.

¶11 On April 20, 2010, five landowners[2] who together owned more than 50 percent of the agricultural and forest land within the district filed a written protest. All parties agree that these landowners owned the requisite acreage to effectively block the zoning proposal pursuant to § 76-2-205(6), MCA.

¶12 On May 14, 2010, Williams filed a complaint in District Court against Commissioners. Williams requested that the District Court declare that the protest provision of § 76-2-205(6), MCA, was unconstitutional because it violated equal protection, due process, and voting rights. Williams also asked for a temporary restraining order and preliminary and permanent injunctions preventing Commissioners from taking any action pursuant to the allegedly unconstitutional protest provision.

¶13 On May 20, 2010, Commissioners filed an answer. Commissioners agreed with Williams that § 76-2-205(6), MCA, was unconstitutional for the reasons set forth by Williams. However, Commissioners admitted that they would apply the protest provision to prevent adoption of the zoning regulations absent an order from the District Court directing otherwise.

¶14 Without objection from Commissioners, the District Court issued an order for a preliminary injunction on May 21, 2010. The order enjoined Commissioners from taking any actions based on § 76-2-205(6), MCA, but permitted Commissioners to proceed in

---

[2] Four of these five landowners are the Appellants in this case, designated "Landowners."

6

accordance with the remaining provisions of § 76-2-205, MCA. On May 26, 2010, Commissioners adopted the North Lolo Rural Special Zoning District.

¶15 Landowners filed an unopposed motion to intervene on May 24, 2010. The District Court granted Landowners' motion to intervene on May 28, 2010. Next, Landowners filed a M. R. Civ. P. 12(b)(7) motion to dismiss on June 3, 2010, arguing that Williams failed to join all of the proper parties pursuant to M. R. Civ. P. 19, which governs joinder of required parties, and Montana's Uniform Declaratory Judgments Act (UDJA), § 27-8-301, MCA, which requires inclusion of all parties who have an interest which would be affected by the declaration.

¶16 On July 14, 2010, Williams filed a motion for summary judgment. Williams' motion for summary judgment sought a declaration from the District Court that the protest provision of § 76-2-205(6), MCA, was an unconstitutional violation of equal protection and voting rights. Williams requested permanent injunctive relief to prevent Commissioners from enforcing the protest provision. Commissioners agreed that § 76-2-205(6), MCA, was unconstitutional and they supported issuance of a permanent injunction. On September 21, 2010, Commissioners filed a separate motion for summary judgment, challenging the constitutionality § 76-2-205(6), MCA, as an unconstitutional delegation of legislative power.

¶17 On July 23, 2010, Landowners filed a motion to stay summary judgment proceedings pending the District Court's disposition of their motion to dismiss. Landowners filed an application to quash, vacate and dissolve the preliminary injunction on August 30, 2010. On October 15, 2010, Landowners filed a motion to quash

7

Commissioners' motion for summary judgment, arguing that Commissioners' motion addressed matters outside the pleadings, and that Commissioners and Williams lacked standing to challenge the constitutionality of § 76-2-205(6), MCA, on the grounds that it represented an unconstitutional delegation of legislative power. In response to Williams' and Commissioners' motions for summary judgment, Landowners maintained that the protest provision was constitutional.

¶18 On February 2, 2011, Williams filed a motion for leave to amend his complaint to add the claim that § 76-2-205(6), MCA, constituted an unconstitutional delegation of legislative power. Williams alleged that this claim was merely a new theory of recovery that arose from the same set of facts contained in the original complaint. The District Court granted Williams' motion to amend his complaint on April 18, 2011.

¶19 On April 5, 2012, the District Court issued its order addressing all of the outstanding and fully briefed motions. The District Court denied Landowners' M. R. Civ. P. 12(b)(7) motion to dismiss, denied Landowners' application to quash, vacate and dissolve the preliminary injunction, and denied Landowners' motion to quash Commissioners' motion for summary judgment. The District Court granted Williams' and Commissioners' motions for summary judgment and concluded that § 76-2-205(6), MCA, was unconstitutional on three grounds: (1) it violated the fundamental right to vote because not all landowners within the district were permitted to participate equally in the zoning process; (2) it violated equal protection rights because there was no compelling state interest in providing some landowners with a vote against zoning regulations while depriving other landowners of the opportunity to vote in favor of the

8

zoning regulations; and (3) it constituted an unconstitutional delegation of legislative power because it failed to provide any standards or guidelines for the application of a protest and failed to provide a legislative bypass to allow for review of a protest. Furthermore, the District Court determined that the protest provision, § 76-2-205(6), MCA, was severable from the remainder of the statute.

¶20 On May 4, 2012, the District Court entered a final judgment in favor of Williams and Commissioners. Landowners appeal.

## STANDARDS OF REVIEW

¶21 When considering a motion to dismiss based on the assertion that an indispensible party is absent, the court is given discretion to determine whether the action will proceed or must be dismissed. *Blaze Constr. v. Glacier Elec. Coop.*, 280 Mont. 7, 10, 928 P.2d 224, 225 (1996); *Mohl v. Johnson*, 275 Mont. 167, 169, 911 P.2d 217, 219 (1996). We review such discretionary rulings for an abuse of discretion. *Blaze Constr.*, 280 Mont. at 10, 928 P.2d at 225; *Mont. Rail Link v. Byard*, 260 Mont. 331, 337, 860 P.2d 121, 125 (1993).

¶22 We review a district court's ruling on a motion for summary judgment de novo, applying the same criteria of M. R. Civ. P. 56 as the district court. *Steichen v. Talcott Props., LLC*, 2013 MT 2, ¶ 7, 368 Mont. 169, 292 P.3d 458; *Brown & Brown of MT, Inc. v. Raty*, 2012 MT 264, ¶ 17, 367 Mont. 67, 289 P.3d 156. Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." M. R. Civ. P. 56(c)(3).

9

¶23  This Court's review of constitutional questions is plenary. *Walters v. Flathead Concrete Prods.*, 2011 MT 45, ¶ 9, 359 Mont. 346, 249 P.3d 913. The constitutionality of a statute is a question of law, and we review a district court's legal conclusions for correctness. *Walters*, ¶ 9. Legislative enactments are presumed to be constitutional, and the party challenging the provision bears the burden of proving beyond a reasonable doubt that it is unconstitutional. *DeVoe v. City of Missoula*, 2012 MT 72, ¶ 12, 364 Mont. 375, 274 P.3d 752; *State v. Ergdorf*, 2003 MT 264, ¶ 12, 317 Mont. 436, 77 P.3d 517.

¶24  The severability of an unconstitutional provision from a statute is a matter of statutory interpretation. *See Finke v. State ex rel. McGrath*, 2003 MT 48, ¶¶ 25-26, 314 Mont. 314, 65 P.3d 576. We review a district court's interpretation of a statute for correctness. *Blanton v. Dep't of Pub. HHS*, 2011 MT 110, ¶ 21, 360 Mont. 396, 255 P.3d 1229; *Stevens v. Novartis Pharms. Corp.*, 2010 MT 282, ¶ 24, 358 Mont. 474, 247 P.3d 244.

## DISCUSSION

¶25  *Did the District Court abuse its discretion in denying Landowners' motion to dismiss Williams' complaint for failure to join them as necessary parties under the Montana Uniform Declaratory Judgments Act?*

¶26  When Williams filed his initial complaint on May 14, 2010, seeking declaratory relief pursuant to the UDJA, he did not include Landowners as parties to the action. Landowners claim that they were "necessary parties" to Williams' action because their interests as protesting property owners would be affected by the District Court's declaration as to the constitutionality of § 76-2-205(6), MCA. Landowners moved to

intervene on May 24, 2010, and the District Court granted Landowners' motion on May 28, 2010. However, by the time Landowners were allowed to intervene, the District Court had already granted Williams' request for a preliminary injunction.

¶27 On June 3, 2010, Landowners filed a M. R. Civ. P. 12(b)(7) motion to dismiss premised on Williams' failure to join all of the proper parties. Landowners asserted that both M. R. Civ. P. 19 and the UDJA required that Landowners must be included as parties to Williams' action. The District Court discussed the application of M. R. Civ. P. 19(a)(1), and determined that "[a]lthough Intervenors [Landowners] may have an interest in the instant action, their interest is not one that is within the provisions of Rule 19(a)(1)." The District Court reasoned that Williams' action was a constitutional challenge to the protest provision of a zoning statute and not a property rights dispute. After concluding that it was not mandatory under M. R. Civ. P. 19(a)(1) to join Landowners, the District Court denied Landowners' motion to dismiss. The District Court noted that "as property owners with an interest in the constitutionality of the zoning statute at issue, Intervenors [Landowners] were properly granted leave to intervene."

¶28 While the District Court's decision on Landowners' motion to dismiss addressed the matter in the context of M. R. Civ. P. 19, it is completely bereft of any analysis of necessary parties under the UDJA. On appeal, Landowners do not challenge the District Court's conclusions concerning M. R. Civ. P. 19. Instead, they assert that the District Court abused its discretion by failing to consider that Landowners were necessary parties under the UDJA.

¶29 Section 27-8-301, MCA, governs "necessary parties" to an action brought under the UDJA and provides as follows:

> When declaratory relief is sought, all persons shall be made parties who have or claim any interest which would be affected by the declaration, and no declaration shall prejudice the rights of persons not parties to the proceeding.

A court's decision as to whether a non-party must be included in a matter depends on the facts and circumstances of the particular case in question. *John Alexander Ethen Trust Agreement v. River Res. Outfitters, LLC*, 2011 MT 143, ¶ 49, 361 Mont. 57, 256 P.3d 913.

¶30 *John Alexander Ethen Trust Agreement* involved a boundary dispute between neighboring property owners. One of the property owners attempted to invalidate the trial court's decision concerning the location of the property boundary for failure to join an indispensable party. *John Alexander Ethen Trust Agreement*, ¶ 22. The property owner argued that other neighboring landowners who owned parcels along the same creek and whose property was divided by the same survey were indispensible. *John Alexander Ethen Trust Agreement*, ¶ 52. This Court disagreed, reasoning that while the other neighboring landowners had an interest in the interpretation of the surveys, they held no legal interest in the disputed acreage at issue in the case. *John Alexander Ethen Trust Agreement*, ¶ 52. Since the only boundary in dispute in the case was between the two parties to the action and the decision would not determine the rights of any other neighboring landowners, we held that the trial court did not abuse its discretion in

declining to join the neighboring landowners. *John Alexander Ethen Trust Agreement*, ¶ 52.

¶31 Williams commenced the action in District Court in direct response to Landowners' use of the protest provision to prevent Commissioners from adopting the proposed North Lolo Rural Special Zoning District. As the parties who exercised their rights under the protest provision, Landowners had a clear interest in the outcome of the District Court's declaration concerning the constitutionality of § 76-2-205(6), MCA. If the District Court declared the protest provision unconstitutional, Landowners' property would be zoned according to the proposed North Lolo Rural Special Zoning District, and Landowners' use of their property would be limited. On the other hand, if the District Court declared that the protest provision was constitutional, Landowners' property would remain unzoned and they would be permitted to develop their property free of regulation. Unlike in *John Alexander Ethen Trust Agreement*, Landowners' legal rights and interests as protesting property owners were directly at issue in Williams' lawsuit.

¶32 The absence of Landowners from Williams' lawsuit created additional problems likely to result in prejudice. The Commissioners, as the defendants in Williams' lawsuit, agreed with Williams that § 76-2-205(6), MCA, was unconstitutional. The Attorney General was given notice of the constitutional challenge to § 76-2-205(6), MCA, but declined to defend the statute.[3] Accordingly, before Landowners intervened, all of the parties before the District Court were of the same mind that the protest provision was

---

[3] Though the Attorney General declined to participate in 2010 in District Court, the Attorney General did participate by filing an amicus curiae brief on appeal and appeared at oral argument before this Court defending the constitutionality of § 76-2-205(6), MCA.

13

unconstitutional. Allowing the lawsuit to continue in the absence of Landowners and without the presence any other party similarly situated would likely have prejudiced Landowners.

¶33 Although we agree with Landowners that they were a necessary party under § 27-8-301, MCA, we do not agree with Landowners that the proper remedy for Williams' failure to name them as a party in his initial complaint is dismissal. M. R. Civ. P. 19 is instructive in determining the appropriate remedy when a required party is absent. Rule 19(a)(2) states that "[i]f a person has not been joined as required, the court must order that the person be made a party."

¶34 Here, the District Court granted Landowners' motion to intervene in the early stages of the litigation. Landowners fully participated in all substantive briefing regarding the constitutionality of the protest provision. Even though the District Court granted a preliminary injunction shortly before Landowners intervened, the preliminary injunction and the Commissioners' adoption of the North Lolo Rural Special Zoning District were subject to the District Court's later determination of the constitutionality of the protest provision. Granting the preliminary injunction was necessary to prevent the issue of the constitutionality of § 76-2-205(6), MCA, from becoming moot. Without the preliminary injunction, Landowners could have built gravel pits in the interim while the case was pending before the District Court, thus rendering the question regarding the validity of the protest provision moot.

¶35 This Court's adherence to the harmless error doctrine requires that "[a]t every stage of the proceeding, the court must disregard all errors and defects that do not affect

14

any party's substantial rights." M. R. Civ. P. 61; *see e.g. Liberty Cove*, ¶ 21. Under the circumstances of this case, we find it unnecessary to dismiss the action in its entirety because the Landowners cannot demonstrate that their substantial rights were harmed in any way by Williams' failure to include them as a party in his original complaint. Landowners' timely intervention remedied Williams' error of failing to initially include them as necessary parties under the UDJA. We therefore conclude that the District Court did not abuse its discretion in denying Landowners' motion to dismiss Williams' complaint.

¶36    *Did the District Court err in determining that § 76-2-205(6), MCA, was an unconstitutional delegation of legislative power?*

¶37    In Montana, the establishment of local zoning districts is governed by statute. A local zoning district can be created in two different ways: (1) by citizen petition to the board of county commissioners under § 76-2-101, MCA, known as "Part 1 zoning," or (2) directly by the board of county commissioners under § 76-2-201, MCA, referred to as "Part 2 zoning." *See Helena Sand & Gravel, Inc. v. Lewis & Clark County Planning & Zoning Comm'n*, 2012 MT 272, ¶ 6, 367 Mont. 130, 290 P.3d 691. This case involves Part 2 zoning pursuant to § 76-2-201, MCA.

¶38    Section 76-2-201, MCA, provides that a board of county commissioners may adopt zoning regulations "[f]or the purpose of promoting the public health, safety, morals, and general welfare." The board of county commissioners is authorized by § 76-2-202, MCA, to "regulate the erection, construction, reconstruction, alteration, repair, location, or use of buildings or structures or the use of land" in zoning districts. In

adopting zoning regulations, the board must consider reasonable provision of adequate light and air, effects of motorized and non-motorized transportation systems, compatible urban growth in the vicinity of cities and towns, the character of the district and its peculiar suitability for particular uses, conserving the value of buildings, and encouraging the most appropriate use of land. Section 76-2-203(2), MCA. Zoning regulations must be made in accordance with relevant growth policies and must, as nearly as possible, be compatible with the zoning ordinances of nearby municipalities. Section 76-2-203, MCA. The county and city-county planning boards serve an advisory role to the board of commissioners by recommending boundaries and appropriate regulations for the zoning district. Section 76-2-204, MCA.

¶39 The procedure for establishing district boundaries and adopting or revising zoning regulations, which includes notice and public hearing requirements, is set forth in § 76-2-205, MCA. Section 76-2-205(6), MCA, contains a protest provision that provides two ways for real property owners within the proposed zoning district to prevent the board of county commissioners from adopting zoning regulations. The protest provision reads as follows:

> Within 30 days after the expiration of the protest period, the board of county commissioners may in its discretion adopt the resolution creating the zoning district or establishing the zoning regulations for the district. However, if 40% of the real property owners within the district whose names appear on the last-completed assessment roll or if real property owners representing 50% of the titled property ownership whose property is taxed for agricultural purposes under 15-7-202 or whose property is taxed as forest land under Title 15, chapter 44, part 1, have protested the establishment of the district or adoption of the regulations, the board of county commissioners may not adopt the resolution and a further zoning resolution may not be proposed for the district for a period of 1 year.

16

Section 76-2-205(6), MCA. At issue in this case is the constitutionality of the provision allowing agricultural and forest landowners representing 50 percent of the titled agricultural or forest land within the district to block a board of county commissioners from adopting a zoning resolution and prevent another from being proposed for one year.

¶40 Section 76-2-205, MCA, was originally adopted in 1963. At that time, the statute contained the language that allowed 40 percent of property owners in a district to protest the establishment of a zoning district or imposition of zoning regulations and effectively prevent the board of county commissioners from taking any action. However, the original version of the statute did not contain the protest provision concerning agricultural and forest land property owners. In 1995, the Legislature debated and ultimately adopted the protest provision at issue in this case. Based on the legislative history, Landowners note that the protest provision was enacted to give large agricultural and forest land property owners more power in the zoning process, and the ability to protect their property interests from unwanted regulation by residential property owners who often greatly outnumber agricultural and forest land property owners in a district.

¶41 Courts have long recognized zoning as a valid form of regulation to promote public health, safety, and welfare. In *Freeman v. Board of Adjustment*, 97 Mont. 342, 351, 34 P.2d 534, 536 (1934), this Court noted that when zoning ordinances were first enacted, they were often challenged as unconstitutionally depriving property owners of liberty and property without due process of law, or attacked as a violation of equal protection rights. Back in 1934, the Court recognized that the "modern trend" nationwide

17

was to uphold the validity of such ordinances and the statutes that authorize them. *Freeman*, 97 Mont. at 351, 34 P.2d at 537. The Court went on to explain that zoning statutes and ordinances are "generally sustained upon the theory that they constitute a valid exercise of the police power; that is to say, they have a substantial bearing upon the public health, safety, morals and general welfare of a community." *Freeman*, 97 Mont. at 352, 34 P.2d at 537 (citing *Euclid v. Ambler Realty Co.*, 272 U.S. 365, 47 S. Ct. 114 (1926)).

¶42 One important way that zoning promotes public health, safety, and the general welfare of a community is by separating incompatible land uses, such as industrial and residential. *See Euclid*, 272 U.S. at 394, 47 S. Ct. at 120. In Montana, gravel and sand mining operations present a common example of this conflict between contrary land uses. The State does not require permitting for certain categories of gravel pits, so counties must rely on zoning to protect residential areas from the industrial impacts often associated with gravel and sand mining operations. *See* § 82-4-431, MCA (providing limited exemptions from state permitting requirements for mining, processing and reclamation); *see also* § 76-2-209, MCA (authorizing reasonable conditions or prohibitions against sand and gravel mining operations in areas zoned as residential, and reasonable conditions on operations in areas not zoned residential). This Court has decided numerous zoning cases in recent years concerning gravel and sand mining operations. *See e.g. Helena Sand & Gravel*; *Gateway Opencut Mining Action Group v. Bd. of County Comm'rs*, 2011 MT 198, 361 Mont. 398, 260 P.3d 133; *Liberty Cove*; *Beasley v. Flathead County Bd. of Adjustments*; 2009 MT 120, 350 Mont. 171, 205 P.3d

18

812; *Flathead Citizens for Quality Growth, Inc. v. Flathead County Bd. of Adjustment*, 2008 MT 1, 341 Mont. 1, 175 P.3d 282; *Merlin Myers Revocable Trust v. Yellowstone County*, 2002 MT 201, 311 Mont. 194, 53 P.3d 1268.

¶43    The instant case is not the first time that the constitutionality of § 76-2-205(6), MCA, has been questioned before this Court.  In *Gateway Opencut Mining Action Group*, an advocacy group challenged the protest provision as an unconstitutional delegation of legislative authority to private parties.  However, this Court did not reach the merits of the constitutional challenge.  We determined that the proposed zoning regulations failed because the board of county commissioners did not act within the statutorily-prescribed deadlines.  *Gateway Opencut Mining Action Group*, ¶ 24.  Therefore, we held that the constitutional question presented to the Court was moot.  *Gateway Opencut Mining Action Group*, ¶ 25.

¶44    In *Bacus v. Lake County*, 138 Mont. 69, 354 P.2d 1056 (1960), this Court set forth the standard for a delegation of legislative power as follows:

> The law-making power may not be granted to an administrative body to be exercised under the guise of administrative discretion.  Accordingly, in delegating powers to an administrative body with respect to the administration of statutes, the legislature must ordinarily prescribe a policy, standard, or rule for their guidance and must not vest them with an arbitrary and uncontrolled discretion with regard thereto, and a statute or ordinance which is deficient in this respect is invalid.

*Bacus*, 138 Mont. at 78, 354 P.2d at 1061 (quoting 73 C.J.S. *Public Administrative Bodies & Procedure* § 29).

¶45    In the context of zoning, this Court has previously held that a lawful delegation of legislative authority "must contain standards or guidelines" to inform the propriety of the

19

exercise of that power. *Shannon v. City of Forsyth*, 205 Mont. 111, 114, 666 P.2d 750, 752 (1983). When no standards or guidelines are present, the exercise of the delegated power may result in "arbitrary and capricious" actions, "dependent wholly on the will and whim" of others. *Shannon*, 205 Mont. at 115, 666 P.2d at 752. The existence of an appellate body with the power to consider exceptional cases is essential to the proper exercise of police power. *Shannon*, 205 Mont. at 115, 666 P.2d at 752. Unlawful delegations of legislative authority run afoul of the due process guarantees of the Fourteenth Amendment to the United States Constitution and Article II, Section 17 of the Montana Constitution. *Shannon*, 205 Mont. at 114, 666 P.2d at 752.

¶46    In *Shannon*, mobile home owners filed a petition with the City of Forsyth seeking a waiver to locate a mobile home in a zoning district which prohibits mobile homes. *Shannon*, 205 Mont. at 112, 666 P.2d at 751. The local ordinance required a successful petition for a variance to include the signatures of at least 80 percent of the landowners residing within 300 feet of the proposed location of the mobile home and also required the signatures of all adjoining landowners. *Shannon*, 205 Mont. at 112, 666 P.2d at 751. We held that the ordinance was unconstitutional as an unlawful delegation of legislative authority and police power. *Shannon*, 205 Mont. at 115, 666 P.2d at 753. We reasoned that the ordinance provided no standard whatsoever by which to judge the neighbors' consents. *Shannon*, 205 Mont. at 115, 666 P.2d at 752. We determined that the ordinance was arbitrary and capricious because the negative vote by a single adjoining landowner could defeat the petition. *Shannon*, 205 Mont. at 115, 666 P.2d at 752. Additionally, we concluded that the ordinance represented an unwarranted application of

police power because the City Council had no power to determine whether a variance should be granted unless a petition was submitted containing all of the required signatures. *Shannon*, 205 Mont. at 115, 666 P.2d at 752-53.

¶47 This Court has struck down several other statutes and ordinances outside the context of zoning as unconstitutional delegations of legislative authority. *See e.g. In the Petition to Transfer Territory*, 2000 MT 342, 303 Mont. 204, 15 P.3d 447 (holding that a statute giving a superintendent the authority to grant or deny petitions to transfer territory among school districts was an unconstitutional delegation of legislative power because the superintendent's broad discretion was "unchecked by any standard, policy, or rule of decision"); *Ingraham v. Champion Int'l*, 243 Mont. 42, 793 P.2d 769 (1990) (deeming a workers' compensation statute an unconstitutional delegation of legislative power because it granted the insurer "absolute discretion" as to what terms, under what circumstances, and in what amounts a lump-sum conversion payment could occur); *In the Matter of Savings & Loan Activities*, 182 Mont. 361, 597 P.2d 84 (1979) (declaring a statute granting the Department of Business Regulation the power to approve or disapprove applications for the merger of savings and loan associations was an unconstitutional delegation of legislative power because it lacked guidelines or substantive criteria); *Douglas v. Judge*, 174 Mont. 32, 568 P.2d 530 (1977) (holding unconstitutional a statute authorizing the Department of Natural Resources and Conservation to make loans to farmers and ranchers who proposed "worthwhile" renewable resource development projects because the statute lacked adequate parameters).

21

¶48 The U.S. Supreme Court has similarly struck down laws as unconstitutional delegations of legislative power when the law "creates no standard by which the power thus given is to be exercised." *Eubank v. Richmond*, 226 U.S. 137, 143-44, 33 S. Ct. 76, 77 (1912). In *Eubank*, a property owner challenged a city ordinance that required municipal authorities to establish building setback lines when such action was requested by two-thirds of the property owners on a street. *Eubank*, 226 U.S. at 141, 33 S. Ct. at 76. The Court determined that the ordinance, by "conferring the power on some property holders to virtually control and dispose of the property rights of others," unlawfully empowered "[o]ne set of owners [to] determine not only the extent of use but the kind of use which another set of owners may make of their property." *Eubank*, 226 U.S. at 143, 33 S. Ct. at 77. In fact, under the ordinance, a single landowner who owned two-thirds of a city block could assert her will against the remaining property owners on the block solely for her own interest or even capriciously, without any standard to guide the exercise of her power. *Eubank*, 226 U.S. at 144, 33 S. Ct. at 77. The ordinance left the Court questioning, "In what way is the public safety, convenience or welfare served by conferring such power?" *Eubank*, 226 U.S. at 143, 33 S. Ct. at 77. A similar result followed in *Washington ex rel. Seattle Title Trust Co. v. Roberge*, 278 U.S. 116, 49 S. Ct. 50 (1928), in which the Court concluded that an ordinance requiring the consent of two-thirds of neighboring property owners to allow a facility for the elderly to expand was unconstitutional because it conferred absolute discretion over whether to issue a permit to property owners without prescribing any standards or rules or providing for review of their decision.

¶49 In reaching its decision that § 76-2-205(6), MCA, represented an unconstitutional delegation of legislative power, the District Court relied heavily on an analogous decision from the South Dakota Supreme Court, *Cary v. City of Rapid City*, 559 N.W.2d 891 (S.D. 1997). Cary petitioned the city to rezone her property from a general agricultural classification to medium density residential. *Cary*, 559 N.W.2d at 892. The city granted Cary's request, but prior to the changes going into effect, certain neighboring property owners filed a written protest to the rezoning pursuant to a statutory protest provision. *Cary*, 559 N.W.2d at 892. The statute provided that if 40 percent of the property owners within and around the district filed written protests against the proposed zoning, it would fail. *Cary*, 559 N.W.2d at 893. Cary challenged the statute as an unconstitutional delegation of legislative power. *Cary*, 559 N.W.2d at 895.

¶50 Relying in part on the Montana decisions *Shannon* and *Freeman*, the South Dakota Supreme Court determined that the protest provision was unconstitutional. *Cary*, 559 N.W.2d at 895-96. The Court reasoned that the protest provision did not provide the necessary guidelines or standards for a protest and as a result, it allowed the use of a person's property "to be held hostage by the will and whims of neighboring landowners" without reason or justification. *Cary*, 559 N.W.2d at 895. As the Court observed, "[s]uch a standardless protest statute allows for unequal treatment under the law and is in clear contradiction of the protections of the due process clause of the Fourteenth Amendment." *Cary*, 559 N.W.2d at 895. Moreover, the Court determined that the absence of a legislative bypass or review provision impermissibly allowed a potentially

23

small number of neighboring property owners to make the ultimate determination of the public's best interest. *Cary*, 559 N.W.2d at 895-96.

¶51 We agree with the District Court that the protest provision in § 76-2-205(6), MCA, which allows property owners representing 50 percent of the agricultural and forest land in a district to block zoning proposals, is an unconstitutional delegation of legislative power. First, the protest provision provides no standards or guidelines to inform the exercise of the delegated power. Second, the protest provision contains no legislative bypass.

¶52 Without any standards or guidelines for the exercise of the delegated power, the protest provision of § 76-2-205(6), MCA, contains the same constitutional infirmities as discussed in *Shannon*, *Eubank*, and *Cary*. The protest provision allows a minority of landowners, or even one landowner, to strike down proposed zoning regulations without any justification or for no reason at all. There is no requirement that the protesting landowners consider public health, safety, or the general welfare of the other residents of the district when preventing the board of county commissioners from implementing zoning regulations. As a result, agricultural and forest landowners can exercise their unfettered power in a proper manner, or in an arbitrary and capricious manner, making zoning decisions dependent wholly on their will and whim.

¶53 The protest provision also lacks provision for review by a legislative body with the power to consider exceptional cases, which was noted as essential to the proper exercise of police power in *Shannon* and *Cary*. Without a legislative bypass provision, a small number of agricultural or forest landowners, or even a single landowner, is granted

24

absolute discretion to make the ultimate determination concerning the public's best interests with no opportunity for review. Not only does the statute lack a provision allowing a legislative body to take action notwithstanding the protest, it actually prohibits the board of county commissioners from even proposing an alternative zoning resolution for a period of one year. In contrast, Montana's Municipal Zoning Act contains an example of a proper legislative bypass. Section 76-2-305, MCA, allows a city or town council or legislative body of a municipality to override a citizen protest to a zoning proposal by a two-thirds vote. When the legislative body retains the authority to make the final decision on a zoning proposal, courts have often determined that the statute or ordinance falls within constitutional bounds. *See e.g. Hope v. Gainesville*, 355 So. 2d 1172 (Fla. 1977); *Trumper v. Quincy*, 264 N.E.2d 689 (Mass. 1970). Section 76-2-205(6), MCA, unlawfully vests this final decision-making power in private individuals.

¶54 Therefore, we conclude that the District Court did not err in determining that the protest provision at issue in this case represents an unlawful delegation of legislative power.

¶55 In his Dissent, Justice Rice touts the rights of the Landowners to acquire and protect their land as reason for upholding the protest provision. The legislative history of § 76-2-205(6), MCA, reveals that the protest provision was enacted to protect agricultural production and the traditional uses of forest and agricultural land. In fact, as Justice Rice acknowledges, the Legislature enacted another statute the same year that the protest

25

provision was adopted, expressly declaring the Legislature's intent to protect agricultural property from governmental zoning:

> **76-2-901. Agricultural activities—legislative finding and purpose.** (1) The legislature finds that agricultural lands and the ability and right of farmers and ranchers to produce a safe, abundant, and secure food and fiber supply have been the basis of economic growth and development of all sectors of Montana's economy. In order to sustain Montana's valuable farm economy and land bases associated with it, farmers and ranchers must be encouraged and have the right to stay in farming.
>
> (2) It is therefore the intent of the legislature to protect agricultural activities from governmental zoning and nuisance ordinances.

The goals of the Legislature are surely salutary. It bears noting, however, that Landowners were not utilizing the protest provision to preserve their ability to "produce a safe, abundant, and secure food and fiber supply" or protect their "right to stay in farming." Rather, Landowners wielded the power of the protest provision to block regulations that would limit their ability to transform their agricultural and forest land into a large industrial gravel pit. Thus, Justice Rice's invocation of "safeguards for agricultural property" as a basis for upholding the protest provision rings somewhat hollow.

¶56 While Justice Rice expresses concern for the property rights of Landowners, his Dissent utterly ignores the property rights of the remaining property owners in the zoning district. These neighboring property owners also have a constitutional right to possess their property and protect it from harm. When zoning regulations are designed to "have a real and substantial bearing upon the public health, safety, morals and general welfare of a community," such regulations do not unduly interfere with the fundamental nature of

26

private property ownership and can in fact bolster the use, enjoyment, and value of property. *Freeman*, 97 Mont. at 355, 34 P.2d at 538.

¶57 Justice Rice attempts to distinguish the instant case by arguing that "Landowners held only the ability to protect and prevent their own land from being zoned, not to approve or impose conditions on their neighbors' property." Dissent, ¶ 78. We disagree with this characterization of the protest provision. The protest power of § 76-2-205(6), MCA, granted Landowners the ability to prevent any zoning regulations from being adopted for the entire North Lolo Rural Special Zoning District, regardless of how or whether the proposed regulations might affect their own land. The protest provision did not merely give Landowners the ability to gain a variance for their own property; it allowed them to block an entire zoning plan from being implemented. Moreover, Landowners could presumably invoke the protest provision year after year so as to indefinitely block zoning. Contrary to the assumption implicit in ¶ 79 of Justice Rice's Dissent, nothing in the protest provision prevents Landowners from engaging in successive protests whenever the board might again attempt to establish zoning regulations.

¶58 We now turn to Justice McKinnon's Dissent. Contrary to the plain language of the statute, Justice McKinnon argues that § 76-2-205(6), MCA, functions as a "condition precedent to zoning." This is simply not the case. This Court has previously defined a condition precedent as "one which is to be performed before some right or obligation dependent thereon accrues." *Holter Lakeshores Homeowners Ass'n v. Thurston*, 2009 MT 146, ¶ 22, 350 Mont. 362, 207 P.3d 334. Section 76-2-205, MCA, contains no

27

provision allowing, let alone requiring, property owners to vote to approve zoning regulations before a board of county commissioners may act. This mischaracterization of the nature of the protest provision derails much of the analysis that follows in Justice McKinnon's Dissent.

¶59 Contrary to the impression left by the Dissents, the sky is not falling. We have concluded that the statute as written unlawfully vests private individuals with legislative power. It bears repeating that appropriate legislative bypass language has been employed over the last century around the country to alleviate similar concerns. The Montana Legislature is certainly free to consider whether and how to reenact the protest provision so that it will pass constitutional muster.

¶60 For these reasons, we respectfully reject the arguments presented by the Dissents.

¶61 *Did the District Court err in determining that § 76-2-205(6), MCA, was an unconstitutional violation of the right to equal protection and the right to suffrage?*

¶62 Based on our resolution of Issue 2 and our determination that the protest provision in question constitutes an unconstitutional delegation of legislative power, we decline to address Landowners' equal protection and right to suffrage constitutional challenges.

¶63 *Did the District Court err when it ruled that § 76-2-205(6), MCA, was severable from the remainder of the statute?*

¶64 We must now consider whether the protest provision of § 76-2-205(6), MCA, is severable from the remainder of the statute. This Court attempts to construe statutes in a manner that avoids unconstitutional interpretation whenever possible. *State v. Samples*, 2008 MT 416, ¶ 14, 347 Mont. 292, 198 P.3d 803; *City of Great Falls v. Morris*, 2006

28

MT 93, ¶ 19, 332 Mont. 85, 134 P.3d 692.  If a law contains both constitutional and unconstitutional provisions, we examine the legislation to determine if there is a severability clause.  *Finke*, ¶ 25; *Sheehy v. Public Employees Retirement Div.*, 262 Mont. 129, 141, 864 P.2d 762, 770 (1993).  The inclusion of a severability clause in a statute is an indication that the drafters desired a policy of judicial severability to apply to the enactment.  *Finke*, ¶ 26; *Sheehy*, 262 Mont. at 141, 864 P.2d at 770.  In the absence of a severability clause, this Court "must determine whether the unconstitutional provisions are necessary for the integrity of the law or were an inducement for its enactment." *Finke*, ¶ 25; *Sheehy*, 262 Mont. at 141, 864 P.2d at 770.  When unconstitutional provisions are severed, the remainder of the statute must be complete in itself and capable of being executed in accordance with the apparent legislative intent.  *Finke*, ¶ 26; *Sheehy*, 262 Mont. at 141, 864 P.2d at 770.  Though "the presumption is against the mutilation of a statute," *Sheehy*, 262 Mont. at 142, 864 P.2d at 770, if removing the offending provisions will not frustrate the purpose or disrupt the integrity of the law, we will strike only those provisions of the statute that are unconstitutional.  *Mont. Auto Ass'n v. Greely*, 193 Mont. 378, 399, 632 P.2d 300, 311 (1981).

¶65    The District Court began its analysis by determining that § 76-2-205(6), MCA, does not contain a severability clause.  Next, the District Court reviewed the legislative history of § 76-2-205, MCA, and noted that there was very little discussion in 1963 when the statute was first enacted concerning the 40 percent protest provision.  Since the protest provision for 50 percent of agricultural and forest landowners was not added until 1995, the District Court concluded that this protest provision was neither necessary for

29

the integrity of the law nor did it induce the statute's enactment. The District Court determined that the protest provision contained in § 76-2-205(6), MCA, was severable from the statute.

¶66    Landowners argue that if the protest provision is found to be unconstitutional, this Court must strike down § 76-2-205, MCA, in its entirety. Landowners argue that the statute contained a severability clause until 1995, and the subsequent removal of the severability clause should be viewed as evidence that the Legislature did not intend for the statute to be severable.

¶67    Our review of the history of § 76-2-205, MCA, demonstrates that when the statute was enacted in 1963, it did in fact contain a severability clause. 1963 Mont. Laws 782, ch. 246, § 11. The severability clause read as follows:

> The provisions of this act shall be severable and, if any of its sections, provisions, exceptions, clauses or parts be held unconstitutional or void, the remainder of this act shall continue in full force and effect.

1963 Mont. Laws 782, ch. 246, § 11. In 1971, the Legislature amended the statute to clarify its language. 1971 Mont. Laws 1176, ch. 273, § 19. The 1971 amendments did not substantively alter § 76-2-205, MCA. The Legislature once again expressed its intent that the statute be severable by including the following severability clause:

> It is the intent of the legislative assembly that if a part of this act is invalid, all valid parts that are severable from the invalid part remain in effect. If part of this act is invalid in one or more of its applications, the part remains in effect in all valid applications that are severable from the invalid applications.

1971 Mont. Laws 1176, ch. 273, § 21.

¶68     According to the Montana Bill Drafting Manual published by the Montana Legislative Services Division, severability clauses are not codified but are published in the annotations.  In 1977, the statute at issue was identified as § 16-4705, R.C.M., and was located in Title 16:  Counties, Chapter 47: Zoning Districts.  At the end of this chapter, the code contained an annotation noting the severability clause.  However, in 1978, the code was renumbered and reorganized.  The statute at issue was renumbered as § 76-2-205, MCA, and moved to Title 76:  Land Resources and Use, Chapter 2:  Planning and Zoning, Part 2:  County Zoning.  The annotation noting the existence of a severability clause was removed from the code, but the legislative history does not demonstrate that the Legislature took any specific action to remove the severability clause.  Severability was not mentioned in later revisions of the statute in 1995 and 2009.  The current version of § 76-2-205, MCA, does not include an annotation noting the existence of a severability clause.

¶69     Even given the checkered background and unclear history of § 76-2-205, MCA, several facts are apparent.  First, when the Legislature enacted the statute in 1963, it expressly included a severability clause.  The original version of the statute contained the protest provision allowing 40 percent of property owners within the district to block a zoning proposal, but it did not include the protest provision concerning agricultural and forest landowners.  The protest provision applicable to agricultural and forest landowners was not enacted until 32 years after the original statute was approved.  Since the statute existed for 32 years without the protest provision at issue in this case, we reject Landowners' argument that the protest provision was necessary for the integrity of the

31

law or served as an inducement for its enactment. Furthermore, the Legislature never took any action at any point in the statute's history that expressly demonstrated its intent to remove the severability clause.

¶70 When the protest provision is severed from the statute, the remaining provisions are complete and capable of fulfilling the legislative intent underlying the statute. The stated purpose of county zoning is to promote "the public health, safety, morals, and general welfare." *See* § 76-2-201, MCA. In the absence of the protest provision, the purposes of the statute can still be achieved. The process set forth in § 76-2-205, MCA, adequately protects the rights of property owners within the district by requiring notice of any proposed changes and by allowing public comment and participation. Under these circumstances, the District Court correctly determined that the protest provision at issue is severable from § 76-2-205, MCA.

## CONCLUSION

¶71 For the foregoing reasons, we affirm the District Court's grant of summary judgment to Williams and Commissioners. We hold that the protest provision in § 76-2-205(6), MCA, is an unconstitutional delegation of legislative power. Accordingly, we strike the protest provision that allows agricultural and forest property owners representing 50 percent of such land within a district to block the board of county commissioners from adopting a zoning proposal and prohibiting the board from proposing further zoning regulations for one year. Since the protest provision utilized by Landowners was unconstitutional and thereby ineffective, we uphold the Commissioners' adoption of the North Lolo Rural Special Zoning District.

/S/ PATRICIA COTTER

We Concur:

/S/ MIKE McGRATH
/S/ MICHAEL E WHEAT
/S/ BETH BAKER
/S/ BRIAN MORRIS

Justice Jim Rice, dissenting.

¶72    In its analysis, I believe the Court misses the big picture:  the Landowners have a constitutional right to property and to protect their property rights from infringement; Missoula County has no constitutional right to zone.

¶73    The Court holds that the protest provision in § 76-2-205(6), MCA, is an unconstitutional delegation of legislative power that violates due process guarantees in Article II, Section 17 of the Montana Constitution and the Fourteenth Amendment of the United States Constitution.  Opinion, ¶ 51.  However, the purported due process violation—that the protest provision confers "the power on some property holders to virtually control and dispose of the property of others," Opinion, ¶ 48 (citing *Eubank*)— did not occur here.  Indeed, the Court has gotten it exactly backwards.  Landowners are not disposing the property of others, but are protecting their own property from disposition.  By the Court's striking of the right to protest zoning restrictions upon their land, it is the Landowners who have been denied due process and their constitutional property rights.

33

¶74 Landowners enjoy the inalienable right of lawfully "acquiring, possessing and protecting property." Mont. Const. art. II, § 3; *see also e.g. Roberge*, 278 U.S. at 121, 49 S. Ct. at 52 (a landowner's right "to devote its land to any legitimate use is properly within the protection of the Constitution."). As mentioned above, there is no constitutionally-based right to zone, and we have recognized the principle that "zoning laws and ordinances are in derogation of the common law right to free use of private property . . ." *Whistler v. Burlington N. R.R.*, 228 Mont. 150, 155, 741 P.2d 422, 425 (1987) (citations omitted). In 1995, the Montana Legislature provided additional safeguards for agricultural property from governmental zoning and nuisance ordinances, *see* § 76-2-901, MCA, which included the protest provision challenged here.

¶75 A delegation of legislative power must confer upon a designated group or agency the ability to create or enact a law. The Court quotes the standard provided in *Bacus* for delegation of legislative powers, Opinion, ¶ 44, but overlooks the point that, for delegation to occur, an agency or group must be given "law-making power" to enact, make, or create a law. *Bacus*, 138 Mont at 78-79, 354 P.2d at 1061. This point was discussed in *Eubank*, where two-thirds of the neighbors petitioned the local government to *institute* a setback restriction that affected the landowner's use of his property. *Eubank*, 226 U.S. at 141, 33 S. Ct. at 76. It was in this context of law-making power that the Supreme Court held, as rephrased by the Court, that "'conferring the power on some property holders to virtually control and dispose of the property rights of others' unlawfully empowered '[o]ne set of owners [to] determine not only the extent of use but the kind of use which another set of owners may make of their property,'" and struck

34

down the ordinance as unconstitutional. Opinion, ¶ 48 (quoting *Eubank*, 226 U.S. at 143, 33 S. Ct. at 77). The Court has here misapplied the holding in *Eubank* by twisting it to support the opposite conclusion.

¶76 This is further illustrated by the U.S. Supreme Court's subsequent explanation. Three years after *Eubank,* the Supreme Court considered whether a Chicago ordinance was an unconstitutional delegation of legislative power in *Thomas Cusack Co. v. City of Chicago*, 242 U.S. 526, 37 S. Ct. 190 (1917). The Chicago ordinance required consent from a majority of residential property owners on the affected city block before a person or company could construct a billboard on the city block. *Thomas Cusack Co.*, 242 U.S. at 527-28, 37 S. Ct. at 190. The Supreme Court held that this landowner check on the city's zoning power was not an unconstitutional delegation of legislative power, and compared Chicago's ordinance to the ordinance at issue in *Eubank*:

> The [ordinance in *Eubank*] permits two-thirds of the lot owners to *impose restrictions* upon the other property in the block, while the [ordinance in *Thomas Cusack Co.*] permits one-half of the lot owners to *remove a restriction* from the other property owners. *This is not a delegation of legislative power*, but is, as we have seen, a familiar provision affecting the enforcement of laws and ordinances.

*Thomas Cusack Co.*, 242 U.S. at 531, 37 S. Ct. at 192 (emphasis added). The constitutional ordinance in *Thomas Cusack Co.* allowed a particular kind of property owners—residential—to block or remove a zoning restriction, *Thomas Cusack Co.*, 242 U.S. at 531, 37 S. Ct. at 190, while the unconstitutional ordinance in *Eubank* conferred power to a group of property owners to enact new property restrictions, *Eubank*, 226 U.S. at 143-44, 33 S. Ct. at 77.

35

¶77 Section 76-2-205(6), MCA, is a landowner protection device akin to that in *Thomas Cusack Co.*, because the protest provision does not confer power to *enact* or *create* a law, as defined in *Bacus*. The protest provision merely permits Landowners, who have a constitutional right to possess and protect their own property, to preserve the status quo by blocking proposed zoning for one year. The fact that some may resent the device enacted by the Legislature to protect property rights does not render it unconstitutional.

¶78 The Court fails to recognize that Landowners held only the ability to protect and prevent their own land from being zoned, not to approve or impose conditions on their neighbors' property. The Court correctly presents the applicable principles articulated in *Shannon* and *Cary*, but does so in errant oversimplification. In *Shannon* and *Cary*, the neighboring landowners were granted the ability to prevent the plaintiff from taking a proposed action on the plaintiffs' *own property*. *Shannon*, 205 Mont. at 112, 666 P.2d at 751 (plaintiff landowners sought a variance to place a mobile home on their own land, which neighbors would not approve); *Cary*, 559 N.W.2d at 892 (plaintiff landowner sought to rezone her land from agricultural to medium density residential, which neighbors protested). Here, the protest power used by the Landowners to prevent zoning of their own land in no way deprived their neighbors from any right to use their own property.

¶79 Finally, § 76-2-205(6), MCA, does not grant to Landowners the power to make a final arbitration necessary to constitute an unconstitutional delegation of legislative power. Rather, a successful protest provides for a one-year suspension of the

36

implementation of new zoning. The County may again engage in zoning after the one year period has passed, with or without modifications. Section 76-2-205(6), MCA. In light of a proper understanding of the mechanism of the protest provision and applicable federal and state precedent, the Court's striking of § 76-2-205(6), MCA, significantly expands the governmental power to zone and erodes the ability of the Legislature and property owners to protect the constitutional rights to lawfully acquire, possess, and protect their property. Mont. Const. art. II, § 3. Many such similar protest provisions in Montana law will now be called into question. In the words of the U.S. Supreme Court, the statutory protest here is "a familiar provision affecting the enforcement of laws and ordinances." *Thomas Cusack Co.*, 242 U.S. at 531, 37 S. Ct. at 192.

¶80 In response to this Dissent, the Court fails to acknowledge the clear analysis of the U.S. Supreme Court distinguishing the constitutionally flawed ordinances in the cases relied upon by the Court from the statute at issue here. The Court instead invokes the property rights "of the remaining property owners in the zoning district," Opinion, ¶ 56, as if this case somehow involved a balancing of rights between property owners. However, there is no balancing of constitutional rights here—at least, there is not supposed to be. Under § 76-2-205(6), MCA, other property owners had the same right as the Landowners to protest or not protest the zoning proposed by the County. The Landowners exercised their right of protest. The issue thus raised and litigated is the right of property owners to resist the *government's* restrictions on the use of their property. The legal conflict is one, not between citizens, but between citizens and the

37

government. And it is a conflict in which the citizens, under the Court's decision, come out the big losers.

¶81 I agree with the Court's conclusion that the District Court erred by rejecting Landowners' claim that they were necessary parties, but disagree that the District Court's error was harmless. By the time the Landowners were allowed to intervene, the District Court had already granted the preliminary injunction and the County Commissioners had already enacted the North Lolo Rural Special Zoning District. The failure to join Landowners denied them an opportunity to argue against the preliminary injunction and in favor of the constitutionality of the statutory protest provisions. By the time Landowners got to make their arguments, the zoning was enacted.

¶82 The District Court should have known that Landowners were both interested and necessary parties to this action from the beginning. The complaint and the answer agreed that Landowners had availed themselves to the protest provision in § 76-2-205(6), MCA, to protect their property from being zoned. By its preliminary injunction, the District Court voided § 76-2-205(6), MCA, without notice to or hearing from the Landowners, whose efforts pursuant to the protest provision were thereby negated. To me, such exercise of raw judicial power is astonishing. The District Court should have engaged in the precisely opposite presumptions—that the statutory protest provision was constitutional and that the constitutional right of property reinforced the need to uphold the statute until demonstrated beyond a reasonable doubt that it was unconstitutional. Landowners' constitutional right to protect their property from governmental intrusion was thereby prejudiced. The Landowners should have come before the District Court as

38

successful protestants who were entitled to rely on the presumption of constitutionality of the protest statute. Instead, they came before the District Court having already lost the battle: the protest provision was struck down, the presumption of the statute's constitutionality was eliminated, and the zoning was already enacted. Landowners had "a snowball's chance" before the District Court.

¶83 The County had no constitutional power to zone; it had only the powers given by the Legislature. The District Court first marginalized the Landowners procedurally and then failed to protect their substantive constitutional rights, granting new powers for government to override property rights.

¶84 I would reverse.


/S/ JIM RICE


Justice Laurie McKinnon, dissenting.

¶85 In my opinion, the Court today fails to distinguish between a zoning regulation and a statute that enables zoning to take place in the first instance. The latter does not implicate considerations of an unconstitutional delegation of legislative authority, while the former may. In failing to make a distinction between enabling provisions of the zoning statute and its substantive provisions, the Court has declared unconstitutional a condition precedent to zoning which the Legislature, as representatives of its citizens, determined was proper to have. We tell the Legislature and Montana citizens today that

you must have zoning in your counties even though 50 percent of agricultural landowners do not want to be zoned. We tell the Legislature and Montana citizens today that we find offensive a statute which prioritizes land ownership, perhaps at the expense of a large number of county residents.

¶86 The Court's decision today allows county commissioners in rural counties to implement zoning measures impacting farm and agricultural land based upon a resolution of county commissioners—normally three individuals in our rural counties. We make these declarations in spite of the Legislature's finding and purpose "to protect agricultural activities from governmental zoning and nuisance ordinances," § 76-2-901(2), MCA, and the Legislature's recognition that agricultural lands in Montana are a basis of Montana's growth and development, § 76-2-901(1), MCA. While recognizing Montana's unique heritage as a basis for upholding statutes in other contexts, we strike down today one of Montana's "unique" statutes designed to protect agricultural lands from governmental zoning. We are obliged as jurists, as compared to legislators, to recognize these distinctions in the law, and to not allow our preference for zoning, in particular circumstances, to confuse our analysis.

¶87 Landowners own the majority of the property subject to the proposed regulations. They own agricultural and forest land and are taxed accordingly. One of the Landowners, Liberty Cove, wanted to build a lake on their property and entered into a purchase agreement with a contractor for the gravel mining operations. On March 8, 2006, Missoula County granted a zoning compliance permit, noting that the site location was not zoned. County commissioners received complaints from Lolo residents

requesting the county enact interim zoning to address environmental and traffic concerns at the site. The Court today notes that Landowners are attempting to "transform their agricultural and forest land into a large industrial gravel pit" and that Landowners were not "utilizing the protest provision to preserve their ability to 'produce a safe, abundant, and secure food and fiber supply' or protect their 'right to stay in farming.' " Opinion, ¶ 55. I do not believe it is for this Court to decide which uses of property have merit and which do not. It seems to me such an analysis is akin to the notion of choosing what speech someone may or may not hear. I, for one, am uncomfortable with the notion that my rights depend on the value another individual gives to the particular use I make of my property, as long as it is lawful. Landowners pay taxes on their agricultural and farm land and their standing under § 76-2-205(6), MCA, has not been challenged. We ought not qualify our analysis by questioning whether they are endeavored in "agricultural production and the traditional uses of forest and agricultural land." Opinion, ¶ 55.

¶88    Zoning regulations are enacted pursuant to the police power of the state. *Euclid v. Ambler Realty Co.*, 272 U.S. 365, 47 S. Ct. 114 (1926).

> The power to zone is exercised primarily by local units of the government. However, local governments have no inherent police powers of their own and therefore no inherent power to zone. Before a local government can legally exercise the zoning power, it must receive a delegation of that power from the sovereign entity inherently possessing it. Most typically, that entity is the state.

6 Patrick J. Rohan, *Zoning and Land Use Controls*, § 35.01 (Matthew Bender 2013). There is thus no inherent power to zone except as has been delegated to local government by its enabling statutes or constitution. *Transamerica Title Ins. Co. v. Tucson*, 757 P.2d

41

1055 (Ariz. 1988); *Riggs v. City of Oxnard*, 154 Cal. App. 3d 526, 201 Cal. Rptr 291 (1984); *Nopro Co. v. Cherry Hills Village*, 504 P.2d 344 (Colo. 1972); *Stucki v. Plavin*, 291 A.2d 508 (Me. 1972); *Sun Oil Co. v. New Hope*, 220 N.W.2d 256 (Minn. 1974); *State ex rel Ellis v. Liddle*, 520 S.W.2d 644 (Mo. Ct. App. 1975); *Nemeroff Realty Corp. v. Kerr*, 38 A.D.2d 437, 330 N.Y.S.2d 632 (N.Y. App. Div. 1972), *aff'd* 299 N.E.2d 897 (1973). The action taken by the local government must not exceed that provided for in its delegation and must be consistent with the enabling legislation. *Smith v. Zoning Bd. Of Appeals of Greenwich*, 629 A.2d 1089 (Conn. 1993); *Board of Township Trustees v. Funtime, Inc.*, 563 N.E.2d 717 (Ohio 1990); *Riggs v. Long Beach,* 538 A.2d 808 (N.J. 1988); *Ramsey v. Portland*, 836 P.2d 772 (Or. 1992); *Jachimek v. Superior Ct.*, 819 P.2d 487 (Ariz. 1991); *Ripso Realty & Dev. Co. v. Parma*, 564 N.E.2d 425 (Ohio 1990). The Supreme Court of North Carolina has aptly described the nature of the delegation of authority to zone:

> Thus, the power to zone is the power of the State and rests in the General Assembly originally. There, it is subject to the limitations imposed by the Constitution upon the legislative power forbidding arbitrary and unduly discriminatory interference with the rights of property owners.
> A municipal corporation has no inherent power to zone its territory and restrict to specified purposes the use of private property in each such zone. . . . Obviously, the General Assembly cannot delegate to a municipal corporation more extensive power to regulate the use of private property than the General Assembly, itself, possesses. Consequently, the authority of a city or town to enact zoning ordinances is subject both to the above mentioned limitations imposed by the Constitution and to the limitations of the enabling statute.

*Zopfi v. Wilmington*, 160 S.E.2d 325 (N.C. 1968) (internal citations omitted).

¶89 Involvement by state legislatures in land-use regulation has been growing since the 1960s. Robert M. Anderson offers the following analysis for the growth of state legislatures' involvement, by way of enabling legislation, into the land-use control field:

> Land-use restriction was assumed to be a problem which could be solved more efficiently on the local level. The rationale of this policy was articulated as early as 1929 by Chief Judge Cardozo of the New York Court of Appeals: "A zoning resolution in many of its features is distinctively a city affair, a concern of the locality, affecting, as it does, the density of population, the growth of city life, and the course of city values."
>
> .   .   .
>
> The growing state participation in land-use regulation has been generated by a combination of problems of a regional nature and local inability to provide solutions. The typical fragmentation of the zoning power, which created numerous zoning authorities in urban areas sharing a common regional problem, made orderly control of development improbable. Legislative bodies, amenable to electors from a small geographic district, predictably enacted zoning regulations which served the provincial interest of their district.
>
> They disregarded the broad interests of the regional community, making solution of area-wide problems difficult, if not impossible. This invited state regulation by legislators who were answerable to a broader constituency. State legislators began to realize that ecological problems would be solved, if at all, only on a state wide basis. This encouraged the adoption of measures to control land use which threatened natural resources, including places of natural beauty or historic interest. In addition, state land use controls were inspired by such other factors as land shortages, fiscal crises, urban deterioration, and a wide variety of community ills which seemed unlikely to be cured by purely local regulation.

1 Robert M. Anderson, *American Law of Zoning 3d*, § 2.03 (1986).

¶90 Pursuant to Montana's Constitution, county commissioners have only that legislative authority specifically granted by the Legislature. Mont. Const. art. XI, § 3(1). The Legislature conditioned their grant of legislative authority to zone by allowing 40% of real property owners or 50% of agricultural land owners to reject any proposed zoning.

While popularly elected county commissioners can vote for or against zoning proposals, they cannot enact zoning ordinances when they have not been granted the authority to do so. The Legislature specifically limited the authority of county commissioners to zone by allowing those most affected by the zoning—the property owners—to reject any proposed zoning. The 1995 protest provision was sponsored by Rep. Trexler who, in his opening statement on HB 358, explained the bill was "not a zoning bill" and was not intended to address public health, safety and welfare because county governments already had in place mechanisms to protect public health and safety. The purpose of the bill was to address if "a group of people are imposing their wishes on their neighbors, they must sit down and talk with their neighbors to reach an agreement." Owners of agricultural land "should be allowed to [manage their property] and not be zoned to [prevent] that." Senate Committee Hearing on HB 358 (March 21, 1995). Then Attorney General Joe Mazurek opined in 1996 that

> [t]here is no controlling decisional law in Montana pertaining to the questions . . . presented and the law of other jurisdictions has limited application given the unusual nature of the Montana statute. Opinions of other jurisdictions are premised on the recognition that the protest provisions of those jurisdictions pertain to the amendment of an existing zoning regulation. The courts recognize that those protest provisions are a form of protection afforded property owners in the stability and continuity of preexisting zoning regulations. Such reasoning is not applicable to the Montana statute, which operates as a form of extraordinary protection afforded property owners to prevent the legislative body *from adopting zoning regulations in the first instance.* As such, the statute operates more like a "consent provision" than a protest provision. Consistent with these observations, the statute's "protest" rights discussed within this opinion are so identified only for purposes of consistency with the actual language of the statute.

46 Mont. Op. Att'y 22 (July 22, 1996) (emphasis added; footnotes omitted).

44

¶91 Initially, it is significant to point out that this Court has previously held valid, as against an attack that the statute was an unlawful delegation of legislative authority, the statutory forerunner to § 76-2-205, MCA. In *City of Missoula v. Missoula County*, 139 Mont. 256, 362 P.2d 539 (1961), this Court found that zoning statutes which created a zoning commission and enabled the county commissioners to enact zoning ordinances validly delegated administrative authority and provided sufficiently clear, definite and certain standards to enable the agency to know its rights and obligations. *See Montana Wildlife Federation v. Sager,* 190 Mont 247, 258, 620 P.2d 1189, 1196 (1980). We said in *City of Missoula*:

> We shall not quote the entire act, but, with respect to the procedure, the law provides definite outlines and limitations. The zoning district may come into being only upon petition of sixty percent of the freeholders in the area. The adoption of the development district must be by a majority of the Commission, after definitely prescribed public notice and public hearing. The resolution must refer to maps, charts, and descriptive matters. In other words, quite adequate procedural matters are contained in the act itself.

*City of Missoula*, 139 Mont. at 260-61, 362 P.2d at 541. Although *City of Missoula* did not directly address the contention raised here, this Court recognized the validity of the statutory provision that prevented the creation of a zoning district until 60% of the freeholders petitioned for its establishment. Significantly, these prior enabling provisions, found to be valid by the Court, "*denied the power to regulate the use of land for grazing, horticulture, agriculture, or the growing of timber.*" *City of Missoula*, 139 Mont. at 258, 362 P.2d at 540 (emphasis added). The Legislature's limitation of zoning authority to a county and its zoning commission has thus been part of our statutory scheme since 1953. Our current zoning statute, § 76-2-205, MCA, actually provides less

45

protection to owners of agricultural and farm lands by not prohibiting zoning outright of these lands, but instead conditioning it upon there being no objection from at least 51% of the landowners of agricultural and farm land.

¶92    I agree with Justice Rice in his Dissent when he states that "the Court has gotten it exactly backwards" in describing our analysis of cases construing protest provisions. Dissent, ¶ 73.  While it is true that the Supreme Court in *Eubank v. Richmond*, 226 U.S. 137, 33 S. Ct. 76 (1912), found an unconstitutional delegation of legislative authority to particular landowners in determining the location of a building line, the authority to establish the building line was not challenged and had already been conferred.  Thus the question was not whether the City of Richmond had authority to create the ordinance, but rather, once conferred, whether that authority was constitutionally exercised.

> The action of the committee is determined by two-thirds of the property owners.  In other words, part of the property owners fronting on the block determine the extent of use that other owners shall make of their lots, and against the restriction they are impotent.  This we emphasize.  One set of owners determine not only the extent of use but the kind of use which another set of owners may make of their property.  In what way is the public safety, convenience or welfare served by conferring such power? The statute and ordinance, while conferring the power on some property holders to virtually control and dispose of the proper rights of others, creates no standard by which the power *thus given* is to be exercised; in other words, the property holders who desire and *have the authority to establish the line* may do so solely for their own interest or even capriciously.

*Eubank*, 226 U.S. at 143-44, 33 S. Ct. at 77 (emphasis added).  Five years later, the Supreme Court explained, in declaring constitutional an ordinance that required consent by a majority of the property holders before billboards could be erected in residential areas, that:

*A sufficient distinction between the ordinance [in Eubanks] and the one at bar is plain. The former left the establishment of the building line untouched until the lot owners should act and then made the street committee the mere automatic register of that action and gave to it the effect of law. The ordinance in the case at bar absolutely prohibits the erection of any billboards in the blocks designated, but permits this prohibition to be modified with the consent of the persons who are to be most affected by such modification.* The one ordinance permits two-thirds of the lot owners to impose restrictions upon the other property in the block, while the other permits one-half of the lot owners to remove a restriction from the other property owners. *This is not a delegation of legislative power, but is, as we have seen, a familiar provision affecting the enforcement of laws and ordinances.*

*Thomas Cusack Co., v. Chicago*, 242 U.S. 526, 531, 37 S. Ct. 190, 192 (1917) (emphasis added). *See also Washington ex rel. Seattle Title Trust Co. v. Roberge*, 278 U.S. 116, 121-22, 49 S. Ct. 50, 52 (1928), where the Court held that "[t]he right of [a property owner] to devote [his] land to any legitimate use is properly within the protection of the Constitution" and thus the consent provision for issuance of a permit to accommodate a larger home for the elderly poor was an unconstitutional delegation of power and "repugnant to the due process clause of the Fourteenth Amendment."

¶93    The Court's reliance on *Cary v. City of Rapid City*, 559 N.W.2d 891 (S.D. 1997), and *Shannon v. Forsyth*, 205 Mont. 111, 666 P.2d 750 (1983), is also misplaced. In *Cary*, the issue was not the authority to zone, but rather whether the authority delegated was constitutionally exercised. Cary sought to have her property *rezoned* which, following protests from neighbors, was denied by the City. The Court determined that the absence of a legislative bypass and a standardless statute regarding her neighbors' protests "allows for unequal treatment under the law." *Cary*, 559 N.W.2d at 895. Similarly, in *Shannon,* several zoning districts had already been established. The issue

was whether there were sufficient standards imposed upon adjoining landowners in denying a petition seeking a waiver to locate a mobile home within a "Residential A" zoning district. This Court determined that the consent ordinance was unconstitutional as an unlawful delegation of legislative authority and police power. *Shannon*, 205 Mont. at 115, 666 P.2d at 753.

¶94 Other jurisdictions have observed a distinction between consent and protest provisions which impermissibly delegate legislative authority and those that condition the exercise of legislative authority on particular conditions having been established. In *O'Brien v. St. Paul*, 173 N.W.2d 462 (Minn. 1969), the Court determined that a provision requiring an owner to obtain written consent of two-thirds of the adjoining property owners prior to rezoning was valid. Consent was determined to be not a delegation of power, but merely a condition precedent to an exercise of power by the city council. The Court referred to rules enunciated from other jurisdictions and adopted the following distinction:

> If the action of the property owners has the effect of legislation—if it *creates* the restriction or prohibition, then it is deemed to fall within the forbidden "delegation of legislative power."
> On the other hand, if the consents are used for no greater purpose than to *waive* or *modify* a restriction which the *legislative* authority itself *has* lawfully *created* and in which creation it has made provisions for waiver or modification, then such consents are generally regarded as being within constitutional limitations.

*O'Brien*, 173 N.W.2d at 465-66 (citing 2 Metzenbaum, *Law of Zoning,* c. X-b-1, p. 1067 (2d ed.). *See also* 1 Yokley, *Zoning Law and Practice* § 7-13, p. 358 (3d ed.). The Washington Supreme Court upheld a similar consent statute and explained:

48

In this case it may readily be seen that the council, recognizing the rights of the residents of the city to be consulted in matters purely local, matters affecting the comfort and even the health of the residents, and the right to have their will reflected in the enactments of their representatives, provided the ordinance for the purpose of meeting the desires of the residents in that regard. The ordinance is prohibitive, but leaves the right to the citizen to waive the prohibition if he chooses. *Statutes of this character are common, and while it is generally conceded that the legislature cannot delegate its legislative function, it is well established that it may provide for the operation of a law which it enacts upon the happening of some future act or contingency. The local option laws in their various phases are common instances. While these laws were violently assailed, and in some instances received judicial condemnation, they are now almost universally sustained.*

*Spokane v. Camp*, 97 P. 770, 771 (Wash. 1908) (emphasis added.). The Illinois Supreme Court explained in 1896 that "[i]t is competent for the legislature to pass a law, the ultimate operation of which may, by its own terms, be made to depend upon a contingency . . . . The legislature cannot delegate its power to make a law; but it can make a law to delegate a power to determine some fact or state of things upon which the law makes, or intends to make, its own action depend." *Chicago v. Stratton*, 44 N.E. 853, 855 (Ill. 1896). The distinction drawn was this:

In the case at bar, the ordinance provides for a contingency, to-wit: the consent of a majority of the lot owners in the block, upon the happening of which the ordinance will be inoperative in certain localities. The operation of the ordinance is made to depend upon the fact of the consent of a majority of the lot owners, but the ordinance is complete in itself as passed. What are known as local option laws depend for their adoption or enforcement upon the votes of some portion of the people, and yet are not regarded as delegations of legislative power. Delegation of power to make the law is forbidden, as necessarily involving a discretion as to what the law shall be; but there can be no valid objection to a law, which confers an authority or discretion as to its execution, to be exercised under and in pursuance of the law itself.

*Chicago,* 44 N.E. at 855 (internal citations omitted).

¶95    A careful and close reading of these cases demonstrates that there exists a clear distinction between those protest and consent provisions that impermissibly delegate legislative authority and those that require a condition precedent to the exercise of legislative authority in the first instance. In my opinion, we have failed to recognize this distinction. I believe it is the role of the Legislature to chart the course of this State in land development and growth. Ultimately, it is up to the citizens to craft their own destiny, but they must do so in the Legislature and not the courts. If they are displeased with zoning provisions in our statutes, then their remedy is to petition their representatives for a change in the law. While I would have no problem scrutinizing a statute for an unconstitutional delegation of authority, that analysis is not called for here. The statute merely imposes a condition precedent to the grant of legislative authority to the counties to zone. I believe courts "should be wary of substituting their economic and business judgment for that of legislative bodies, and should avoid the temptation, however attractive, to sit as a 'super-legislature to weigh the wisdom of legislation.' " *McCallin v. Walsh*, 64 A.D.2d 46, 59, 407 N.Y.S.2d 852, 859 (N.Y. App. Div. 1st Dept. 1978) (quoting *Day-Brite Lighting v. Missouri*, 342 U.S. 421, 423, 72 S. Ct. 405, 407 (1952)).

¶96    I respectfully dissent.


                                        /S/ LAURIE McKINNON



50